**In re Karen de KLEINMAN, Debtor.**

**In re Sabrina KLEINMAN, Debtor.**

**Bankruptcy Nos. 91–B– 11913, 91–B–14843.**

United States Bankruptcy Court, S.D. New York.

July 1, 1993.

**132**

Karen de Kleinman, pro se.

Karen de Kleinman as Attorney-in-Fact, Carlsbad, CA, for Sabrina Eve Kleinman a/k/a Sabrina de Kleinman.

Conway, Farrell, Curtin & Kelly, P.C., New York City by Nicholas P. Chrysanthem, for Dime Sav. Bank.

*MEMORANDUM DECISION GRANTING MOTION OF DIME SAVINGS BANK OF WILLIAMSBURGH TO LIFT AUTOMATIC STAY (185 WEST END AVENUE, APARTMENT 4–D, NEW YORK CITY)*

PRUDENCE B. ABRAM, Bankruptcy Judge.

The debtors in these Chapter 11 cases are mother and daughter. Both pre- and post-petition the mother has attempted to fend off foreclosures of her interests in various apartments located in New York City through prolific litigation which the mother has stated has all but consumed her life. This matter appears to be a garden variety motion to lift the automatic stay to permit foreclosure of a lien on a residential cooperative apartment. In another case, the matter would have long ago been resolved. However, the mother has undertaken to embark on a scorched earth campaign of litigation, including making numerous attacks on the court's integrity. As soon as this court has heard and rendered a decision on one matter in these cases, the mother has filed motions for reargument, appeals, and even a corporate bankruptcy case. What taken individually could be viewed as a reasonable exercise of right, taken collectively reflects an abject unwillingness to be bound by the rulings of any court, if she deems these rulings to be adverse to her.[1]

A brief summary of this matter would indicate that there can be little doubt as to the proper outcome: the automatic stay should be lifted. Neither debtor resides in the apartment. Nor is either debtor paying or capable of paying the maintenance charge or the mortgage payments for the apartment. The debtors urge that they could sublet the apartment. Yet they admit they could not sublet the apartment for an amount sufficient to pay the monthly maintenance charge and mortgage payment. Moreover, there are substantial pre- and post-petition arrears in the maintenance payments. The cooperative corporation does not permit long-term sublets and has never approved a sublet for a tenant in arrears. Nor do the debtors dispute that the present value of the apartment is less than the amount of the mortgage.

Against this the debtors have woven a tale of misconduct by the lender and the cooperative corporation. This matter is

---

1. Most recently the mother has gone so far as to file a notice of appeal from an order of this court which *granted* a motion to permit reargument and scheduled a hearing date for the reargument.

further complicated by extensive pre-petition litigation among the debtors, the lender and the cooperative corporation. Unfortunately, the lender has not offered any comprehensive analysis of the history of that litigation or its present status and the cooperative corporation did not join in the lender's lift-stay motion.

This is the fourth decision this court has written in the mother's case on motions to vacate the automatic stay. See *In re de Kleinman*, 136 B.R. 69 (Bankr.S.D.N.Y. 1991) (*"de Kleinman I"*) (stay lifted as to Unit 38C, Olympic Towers, 641 Fifth Avenue, New York City on grounds that the Debtor had no rights to the apartment, the natural term of the lease having expired); *In re de Kleinman*, 136 B.R. 74 (Bankr. S.D.N.Y.1992) (*"de Kleinman II"*) (stay lifted as to Unit 26A in the same building for cause since the Debtor was not the record owner and was using the automatic stay in lieu of an appeal bond in connection with her various litigations involving this unit; court directed hearing on valuation as to Unit 39E); and *In re de Kleinman*, 150 B.R. 524, (Bankr.S.D.N.Y.1992) (Request for hearing date and for stay pending appeal denied). Familiarity with these decisions will be presumed.

This matter involves a motion made by The Dime Savings Bank of Williamsburgh ("Dime"). Dime seeks to lift the automatic stay to permit it to foreclose a lien on a cooperative apartment, Apartment 4–D, located at 185 West End Avenue, New York City (the "Apartment"). The Apartment is jointly owned by the debtors.

The debtors oppose the motion. The mother has appeared *pro se* and as attorney-in-fact for her daughter. As is the case with Unit 26–A in Olympic Tower (*See de Kleinman II*) the debtors do not seek to use the processes of the Bankruptcy Court to effectuate a sale of the Apartment. An all-day trial was held on March 10, 1992 (the "Trial").

This decision contains the court's findings of fact and conclusions of law. For the reasons set forth below, the court grants the motion. A separate order lifting the stay and denying the balance of the relief sought by Dime is being signed concurrently herewith.

## Findings of Fact

### The Debtors

1. Karen de Kleinman ("Karen"), the mother, filed a petition under Chapter 11 of the Bankruptcy Code on April 27, 1991.

2. Sabrina Eve Kleinman, a/k/a Sabrina de Kleinman ("Sabrina"), the daughter, filed a Chapter 11 petition October 28, 1991. Sabrina and Karen will be referred to collectively as the "Debtors".

### The Apartment

3. Neither of the Debtors currently lives in the Apartment. Karen originally rented the Apartment in 1968 and she lived there for approximately thirteen years with Sabrina. In 1981 Karen began living part time in an apartment in Olympic Towers in New York City. In 1982, Karen moved out of the Apartment completely while Sabrina continued to live there by herself. Since 1988 however, Sabrina has not been living in the Apartment because she has been living in California attending college and graduate school. While Sabrina's plans for the future are uncertain, she has no present intention to occupy the Apartment in the definite future.

4. The Apartment is a two bedroom, two bath apartment located on a corner of the 4th floor in a building which is one of a complex of eight buildings known as Lincoln Towers. The Apartment, which has a terrace, faces the street and has a tree-top view. Karen considers the Apartment to be one of the most desirable in the building due to its location.

5. Since the Apartment is a cooperative, the Debtors own shares in a cooperative cooperation, which is known as 185 West End Avenue Owners Corp. (the "Cooperative Corporation"), and have a proprietary lease to the Apartment. The buildings in the Lincoln Towers complex were converted from rental units to cooperative ownership in or about 1987. Each of the buildings is a separate cooperative corporation.

*Dime's Loan and the Debtors'
Subsequent Default*

6. The Debtors purchased the Apartment in 1987 for $131,000, which was the insider price. Within two weeks, they had obtained a secured loan from Dime for $250,000. The Debtors pledged the 458 shares of common stock allocated to the Apartment and the proprietary lease for the Apartment to Dime as collateral for the loan. Both Debtors signed a Loan Note (the "Note") and Loan Security Agreement (the "Loan Security Agreement") with Dime. There is nothing in the record which indicates how the Debtors utilized the $119,000 of loan proceeds that exceeded the cost of the Apartment. Neither Debtor reflects possession of cash or cash equivalents in her Schedules in this amount.

7. The Note is dated June 19, 1987 and, absent acceleration, comes due on July 1, 2017. The payments are based on a floating rate, adjustable yearly. The present monthly payment is $2,034.27. As of the date Karen's case was filed, Dime was owed $282,894.41. This amount was comprised of the principal balance then due of $244,502.50, advances of $2,236.50, late charges of $141.36, and interest through that date of $36,014.05.

8. The terms of the Note provide that Dime has the right to accelerate all payments due if the Debtors fail to make any payment under the Note or the Loan Security Agreement within 15 days after it is due.

9. Under the terms of the Loan Security Agreement, the Debtors were in default when they "[did] not make a payment due". The Loan Security Agreement further provides that "if [the Debtors] [are] in default and fail to pay the entire balance due under the Note within 5 days after receiving written notice, Dime has the right to sell the property and use the proceeds to pay the entire balance due." In addition, the Debtors are liable for any difference between the sales proceeds and the balance due.

10. On April 11, 1990, a Notice of Default was served upon the Debtors.

11. On April 25, 1991, an order granting foreclosure of the property was entered by the Supreme Court of the State of New York, County of New York.

12. The Debtors appealed from the order and have sought to invalidate the judgment of foreclosure.

13. The Debtors have made no payments to Dime either before or after their respective Chapter 11 filings since the Notice of Default.

*The Sublease and the Cooperative's
Eviction Action Against the
Debtors*

14. The Cooperative Corporation has the right to approve or disapprove all subleases of apartments in the building. It is the policy of the Cooperative Corporation to limit subleasing to a maximum of two years, with the possible grant of a third year in exceptional circumstances.

15. In August of 1988, Karen, who is a real estate broker, located a subtenant and secured approval from the Cooperative Corporation to sublease the Apartment. While the Debtors are engaged in litigation with the Cooperative Corporation over the sublease, as described below, it is clear that the Cooperative Corporation did grant the Debtors permission to sublease the Apartment for at least one year and the subtenant did take occupancy of the Apartment and commence paying rent.

16. In April of 1990, the Cooperative Corporation commenced eviction proceedings against the Debtors and their subtenant. The Cooperative Corporation alleged that in August of 1989 the Debtors entered into an unauthorized sublease in breach of their lease. The Cooperative Corporation also alleged that the Debtors had failed to pay their monthly maintenance charges and the arrears thereon.

17. The Debtors have brought a lawsuit in state court against the Cooperative Corporation based on claims that the Cooperative Corporation wrongfully sought to evict the Debtors and caused them to lose their subtenant who had expressed an interest in purchasing the Apartment at the end of the sublease term. The Debtors have joined Dime in this suit alleging that Dime con-

spired with the Cooperative Corporation in attempting to evict the Debtors and wrongfully sought to foreclose its lien on the Apartment. The Debtors claim damages in the millions of dollars.

18. The Debtors have failed to pay the maintenance charges on the Apartment since their respective petitions were filed. The maintenance is $990.42 per month. Further, no maintenance payments had been made by either Debtor for several years prior to the filing of their petitions. The Cooperative Corporation has asserted that the maintenance arrears, including late charges and collection fees, were $38,737.51 through March 1, 1992.

19. Seth Simon ("Simon"), a representative of the managing agent of several of the buildings in the Lincoln Towers complex, including the building in which the Apartment is located, testified at trial that he is unaware of any circumstance with respect to any building in the complex where the Cooperative Corporation approved a sublet when the owner of an apartment was in arrears.

### Debtors' "Plan of Reorganization" Regarding the Apartment

20. Karen testified that the Apartment is vital to the Debtors' reorganization efforts because it is capable of producing income through subleasing it to third parties.

21. Karen testified that neither she nor Sabrina presently have a source of income that would be sufficient to enable them to make the $3,026.69 monthly payment on the Apartment which is equal to the maintenance charges of $992.42 plus the mortgage payment of $2,034.27.

22. Karen testified that were the Debtors able to sublet the Apartment the rents collected therefrom would not meet their monthly obligations.

23. The sole source of income or assets that the Debtors have identified as a source of funding for retention of the Apartment pursuant to a plan of reorganization are the lawsuits against Dime and the Cooperative Corporation. However, the Debtors

have been unsuccessful to date in those lawsuits. The prospect of any recovery in those lawsuits in favor of the Debtors must be considered speculative.

### Valuation of the Apartment

24. Dime's appraiser, Fred Klages, appraised the Apartment at $175,000. He did not physically inspect the Apartment. His valuation was based on comparable sales for apartments in the Lincoln Towers complex for the prior two years.

25. Simon, who was subpoenaed by the Debtors, testified at the Trial as to recent comparable sales in the building in which the Apartment was located as well as to comparable sales in other buildings in the complex. He stated that recent purchase prices for the "D" line of Apartments ranged from $257,000 for Apartment 10–D in April of 1990 (located Debtors' building) to $195,000 for Apartment 3–D (located directly below the Debtors' apartment) in December of 1990 to $192,500 for Apartment 5–D in March of 1991 (located in 180 West End Avenue, the building directly across from the Debtors' in an east-west direction).

26. The Debtors did not hire an appraiser to appraise the Apartment nor did they have an appraiser to testify at the Trial.

27. The Debtors qualified Karen as a real estate expert. Karen testified that in her opinion, at the time of trial, the value of the Apartment was in the $210,000 to $215,000 range.

28. The Debtors conceded that no matter which valuation is used, the value of the Apartment is less than the amount that is owed to Dime.

29. The court finds that the value of the Apartment at the time of Trial was $195,000. This value conclusion is mid-way between the value conclusions of the appraiser and Karen. The court has reached its value conclusion on the basis of the actual sales figures testified to by the managing agent which the court believes is the best

basis for determination of value.[2] The court's value conclusion would indicate that the value of the Apartment appreciated approximately $65,000, about 50%, in the five years between the time the Debtors purchased the Apartment and the Trial. Although the court is concerned about reaching a value conclusion that reflects a large appreciation in what was otherwise a declining market, the court has concluded that value of apartments in the Lincoln Towers complex purchased at insider prices did rise in that magnitude because of the size of the complex, its proximity to the Lincoln Center area and the removal of uncertainty about the economic viability of the conversion due to the passage of time. The court notes that its value conclusion is the same as the sale of an identical apartment on the floor below two years earlier. While the court accepts Karen's opinion that the Apartment is more attractive than that apartment, the court is of the opinion that $195,000 is an appropriate value given the continued general decline in the real estate market which occurred in the intervening two years.

### DISCUSSION

### GOVERNING LAW

■ Bankruptcy Code § 362(a) provides for an automatic stay of actions against a debtor and against property of the estate upon the filing of the petition. Secured creditors are therefore stayed from foreclosing on their liens unless and until they secure relief from the automatic stay. *See* Bankruptcy Code § 362(d); *see In re Fugazy Express, Inc.*, 982 F.2d 769, 776 (2d Cir.1992); *see generally, Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir.1976), *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977); *reh'g denied*, 430 U.S. 976, 97 S.Ct. 1670, 52 L.Ed.2d 372 (1977).

■ Code § 362(d) provides two alternative grounds upon which relief from the automatic stay may be sought. Under Code § 362(d)(1) relief may be sought "for cause, including the lack of adequate protection of an interest in property of such party in interest." Relief may also be granted under Code § 362(d)(2) with respect to a stay of an act against property if (A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization." Dime has sought relief from the automatic stay under both Code § 362(d)(1) and Code § 362(d)(2).

■ Pursuant to Code § 362(g)(1), Dime, as the party requesting relief from the stay bears the burden of proof on the issue of the Debtors' equity in the Apartment. The Debtors, the parties opposing the relief, have the burden of proof on all other issues pursuant to Code § 362(g)(2).

■ The standards for lifting the stay set forth in Code § 362(d)(1) and (2) are in the disjunctive. If the court finds either that the secured creditor lacks adequate protection or that the Debtors have no equity in the property and no need for the property to effectively reorganize, the court must lift the stay. *In re Diplomat Electronics Corp.*, 82 B.R. 688, 692 (Bankr. S.D.N.Y.1988). Because the court concludes that the Debtors lack equity in the Apartment and that the Apartment is not necessary for an effective reorganization, the court need not address the issue of adequate protection.

### A. *Lack of Equity in the Property*

■ For purposes of Code § 362(d)(2), "equity" is the difference between the value of the property and the total of the claims which it secures. *In re Diplomat*, 82 B.R. at 692. All parties to this proceeding acknowledge that the Debtors have no equity in the Apartment. *See* Findings 24–29. As of the date Karen's petition was filed in April of 1991, Dime was owed $282,894.41. Since that date the Debtors have made no post-petition payments. At the Trial Dime presented an expert witness who appraised the Apartment at $175,000. The Debtors disputed this valuation and

---

**2.** Under appraisal theory, the effort is to determine what a willing buyer would pay a willing seller given an adequate exposure to the market and sufficient time for marketing.

offered Karen's opinion that the Apartment should be valued at approximately $215,000. The court has determined the value of the Apartment to be $195,000. *See* Finding 29. Therefore, the court finds that the present value of the Apartment is at least $87,894.41 less than the amount the Debtors owe to Dime.[3] The court concludes that Dime has satisfied its burden of proof on the issue of the Debtors' lack of equity in the Apartment and thus the first condition of Code § 362(d)(2) has been met.

## B. *The Prospect for an Effective Reorganization*

■ The issue that remains is whether the Debtors have met their burden of proving that the Apartment is necessary for an effective reorganization under Code § 362(d)(2)(B). The United States Supreme Court, in *United States Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (*"Timbers"*) laid down standards for the application of the "necessary for an effective reorganization" test under Code § 362(d)(2)(B) when it held that:

> "[o]nce the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is 'necessary to an effective reorganization.' *See* § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means * * * that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.' "

484 U.S. at 373, 108 S.Ct. at 632 (citation omitted, emphasis in original).

### 1. *The Apartment is not Necessary to the Debtors' Plan of Reorganization*

The Debtors, in seeking to sustain their burden of proof that the Apartment is necessary to an effective reorganization, have suggested a plan that is dependent on whether or not the Debtors can sublease the Apartment and generate income in an amount equal to or greater than the aggregate $3,026.69 monthly charges owed to the Cooperative Corporation and to Dime.[4] The Debtors' plan however, cannot withstand scrutiny and is not feasible for several reasons.

### a. *The Cooperative Corporation is Unlikely to Authorize a Sublease on the Apartment*

The Cooperative Corporation has the absolute right to approve or disapprove all subleases in the Lincoln Towers complex. It is the policy of the Cooperative Corporation to limit subleasing to a maximum of two years, with the possible grant of a third year in exceptional circumstances.

In August of 1988, the Debtors secured approval from the Cooperative Corporation to sublease the Apartment for at least one year and a subtenant did take occupancy of the Apartment and did pay rent. However in April of 1990 the Cooperative Corporation commenced eviction proceedings against the Debtors and their subtenant. The Cooperative Corporation alleged that in August of 1989 the Debtors entered into an unauthorized sublease in breach of their proprietary lease. The Cooperative Corporation also alleged that the Debtors had failed to pay their monthly maintenance charges and arrears thereon.

---

**3.** However, were the court to have accepted Karen's $215,000 appraisal of the Apartment, it would still be undisputed that the present value of the Apartment would be at least $67,894.41 less than the amount the Debtors owe to Dime.

**4.** It must be noted that neither of the Debtors have, as of this date, filed a plan of reorganization. In addition, the Debtors have not made a formal submission to the court detailing in what way the Apartment is necessary for the effective reorganization of either of them, although the Debtors have stated in their papers that the Apartment is Sabrina's sole income producing asset from which her creditors can be paid and thus it is crucial to her ability to effectively reorganize. The Debtors have also stated that the Apartment is essential for Karen's effective reorganization although they have not offered any reasons therefor.

The Debtors filed a countersuit against the Cooperative Corporation alleging that the Cooperative Corporation wrongfully sought to evict the Debtors and caused them to lose their subtenant who had expressed an interest in purchasing the Apartment at the end of the sublease term. The Debtors joined Dime in the suit alleging that Dime conspired with the Cooperative Corporation in attempting to evict them and wrongfully sought to foreclose its lien on the Apartment.

As of March 1, 1992 the Debtors owed the Cooperative Corporation $38,737.51 in monthly maintenance charges and arrears thereon, including late charges and collection fees. Since the Trial at least an additional $15,846.72 has accrued in monthly maintenance charges.

While the resolution of the sublease dispute is a matter for the state court to decide, this court finds that since (i) the Cooperative Corporation is owed at least $54,584.23 in maintenance charges and arrears thereon; (ii) the representative of the managing agent of Lincoln Towers has testified that he is unaware of any circumstance with respect to any building in the complex where the Cooperative Corporation approved the sublet of an apartment when the owner was in arrears; and (iii) the Cooperative Corporation and the Debtors are presently litigating a dispute involving the authorization of a past sublease, it is unlikely that the Cooperative Corporation will approve a sublease as part of the Debtors' plan of reorganization. In any event, any sublease could only be of short duration.

b. *Assuming a Sublease is Approved, the Debtors Cannot Meet their Obligations*

Assuming *arguendo* that the Cooperative Corporation would approve the sublease of the Apartment, in their Response to Dime's Notice of Motion the Debtors estimated that the Apartment could be sublet for approximately $2,000 per month. It is evident that the rental income generated by such a sublet would be insufficient to pay both the monthly maintenance charges

of $990.42 and the monthly loan payments of $2,034.27, for an aggregate monthly required payment of $3,026.69. Although no new testimony was heard at the Trial as to the potential monthly rental value of a sublease of the Apartment, Karen conceded at the Trial that any rental income earned would in fact be less than the aggregate monthly charges due on the Apartment. Thus, such a use of the Apartment would produce an operating loss of approximately $1,000 per month.

c. *Deacceleration of the Note is not Feasible*

Since the Debtors failed to make payments due on the Note, Dime accelerated the loan. Code § 1124(2) however, would permit the Debtors, pursuant to their reorganization plan, to deaccelerate the loan "notwithstanding any contractual provision or applicable law" provided that the Debtors "cure" any defaults under the Note or Loan Security Agreement and compensate Dime "for any damages incurred as a result of any reasonable reliance by [Dime] on such contractual provision or such applicable law." Deacceleration in this case, however, is not feasible because Karen testified at the Trial that neither Debtor has funds to pay the required aggregate maintenance and loan payments on an ongoing monthly basis nor does either Debtor have funds for curing their defaults and paying any arrearages thereon.

d. *Equities Do Not Favor the Debtors' Plan of Reorganization*

In addition to all of the facts which preclude the feasibility of the Debtors' assertion that the Apartment is necessary to their plan of reorganization, equitable considerations also militate against the Debtors' proposals.

The Debtors purchased the Apartment for $131,000, which was the insiders price. Two weeks later they refinanced the Apartment with a $250,000 loan from Dime secured by their shares in the Cooperative Corporation and the proprietary lease on the Apartment. With the proceeds of the loan, the Debtors retired the outstanding

debt on the Apartment and were left the $119,000 of the loan proceeds that exceeded the cost of the Apartment. In addition, since defaulting on the Note, the Debtors have made no payments due thereon, nor have they indicated any willingness to do so. In essence, the Debtors are asking this court not only to allow them to keep the Apartment even though they have no means with which to meet their monthly obligations, but also to overlook the fact that through refinancing they have already received $119,000 in cash based on their ownership of the Apartment, which amount neither Debtor has accounted for. It is clear that the only beneficiaries of any plan involving the Apartment would be the Debtors who have already reaped substantial financial rewards from their ownership of the Apartment. This court will not countenance such an inequitable result.

Given all of the facts and circumstances set forth above, the court finds that no benefit can be derived by supporting a course of action which is not feasible on its face. The court holds that the Debtors have failed to sustain their burden of proof that Apartment is necessary to the successful reorganization of the Debtors.

2. *No Effective Reorganization is in Prospect*

Along with determining whether the Apartment is necessary to the Debtors' re-organization plan, this court must also determine whether the Debtors have presented a reorganization plan that is in prospect. Again, the court must follow the dictates of *Timbers*. Hence, the Debtors must show that they have "a reasonable possibility of a successful reorganization within a reasonable time." 484 U.S. at 373, 108 S.Ct. at 632 (citation omitted).

The Debtors have submitted no facts which would lead this court to conclude that they have sustained their burden of proof that an effective reorganization is in prospect. In the two years their cases have been pending, the Debtors have not filed or proposed a plan of reorganization. The Debtors' urge that a reorganization presents the only hope for them to recover.[5] However, the court questions the Debtors' proposition and believes that converting the cases to Chapter 7 might be preferable because Chapter 7 would afford the Debtors a discharge under appropriate circumstances. Moreover, the court is unable to find that the Debtors have made any factual showing that a reorganization is possible, let alone reasonably likely within a reasonable amount of time.

The Debtors have not demonstrated an ability to generate any income from the Apartment, nor do they have any source of funds sufficient to cure their defaults and to pay their aggregate monthly expenses due and owing on the Apartment.[6]

---

**5.** Although either case is subject to conversion or dismissal on appropriate motion, the United States Supreme Court has resolved a controversy over whether individuals could file under Chapter 11, in favor of allowing individual debtors who were not business people to so file. *See Toibb v. Radloff,* —— U.S. ——, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991).

**6.** Although in discussing their proposals for their plans of reorganization, the Debtors indicated that they would not attempt to reduce or "strip" Dime's lien to the value of the Apartment (in fact the Debtors' appraised the Apartment at a *higher* value than did Dime's appraiser), at the Trial, the court was concerned by the issues raised by the United States Supreme Court in *Dewsnup v. Timm,* —— U.S. ——, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). In *Dewsnup,* the Supreme Court held that Chapter 7 debtors may not strip down liens against property of the estate because "liens pass through bankruptcy

unaffected." However, the Supreme Court limited its holding to the facts and circumstances of the *Dewsnup* case.

Subsequent to the *Dewsnup* decision but before the Trial, the Second Circuit had held that lien stripping was permissible in Chapter 13 cases. *In re Bellamy,* 962 F.2d 176 (2d Cir. 1992). Subsequent to the Trial, the Supreme Court overruled *Bellamy* in *Nobleman v. American Savings Bank,* —— U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), holding that Code § 1322(b)(2) prohibits a Chapter 13 debtor from relying on code § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence.

While it has been generally held that *Dewsnup* does not apply to Chapter 11 cases, *see, In re 680 Fifth Avenue Associates,* 156 B.R. 726, 732, n. 7, (Bankr.S.D.N.Y.1993); *In re Jones,* 152 B.R. 155, 173 (Bankr.E.D.Mich.1993); *In re Butler,* 139 B.R. 258, 259 (E.D.Okla.1992), there have been courts which have held the contrary. *See, In re*

Moreover, the only other potential sources of income which the Debtors have identified to fund any proposed plan of reorganization are potential multimillion dollar damage awards in lawsuits the Debtors have filed against the Cooperative Corporation and Dime in the instant case and against Citibank, N.A. and the Board of Directors of Olympic Towers. *See generally, de Kleinman I* and *de Kleinman II.* While the Debtors blithely treat these lawsuits as "money in the bank" when suggesting their plan, this court cannot be so sanguine and will not approve a plan whose sole source of funding are the speculative proceeds of various lawsuits in which the Debtors have not yet prevailed and whose resolutions do not seem likely in the near future.

The court finds that the totality of the financial behavior of these Debtors, particularly of Karen (See *de Kleinman I* and *de Kleinman II*), is such that the court has no choice but to conclude that both Debtors lack the financial ability and the financial responsibility necessary to propose a confirmable plan of reorganization that would include the Apartment. These Debtors, particularly Karen, have been given many opportunities to attempt to rehabilitate themselves and they have repeatedly refused to accept any responsibility for their course of conduct. Whatever initial equities may have been in their favor have long since disappeared.

While the court is concerned as to what each of these Debtors would have to do as a matter of law to propose a confirmable plan of reorganization, the court concludes that the Debtors' failures are ones of fact. Accordingly, even without reviewing any plan of reorganization submitted by the Debtors, this court concludes that the Debtors cannot feasibly reorganize in a reasonable time period. *See In re Canal Place Limited Partnership*, 921 F.2d 569 (5th Cir.1991).

■ Finally, Dime has also asked this court to permanently enjoin the Debtors from interfering with the exercise of its rights under both the Note and Loan Security Agreement. While the court is sympathetic to the level of frustration these Debtors cause, the court finds that Dime's request is procedurally deficient and an adversary proceeding must be commenced to effectuate such relief. Any procedural error in these cases would simply be compounded by the Debtors' multifarious tactics. The court therefore denies this aspect of the relief requested by Dime without prejudice.

## Conclusion

For the foregoing reasons, this Court grants Dime's motion for relief from the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code and denies the balance of the relief sought by Dime, without prejudice. A separate order has been signed.

---

*Blue Pacific Car Wash, Inc.,* 150 B.R. 434 (W.D.Wis.1992).

At the Trial, the court questioned the parties regarding the relevance of the Supreme Court's decision in *Dewsnup* to the Debtors' personal Chapter 11 cases. The court requested post-trial written submissions from the parties on this issue. To date, the court has received little or no assistance from the parties regarding the applicability of *Dewsnup* in this case.

While the issues raised in *Dewsnup* and *Nobleman* are still troubling to the court as they pertain to personal chapter 11 cases, the court will not rule on matters which are not before it. This court feels constrained to note that it would be anomalous for individual Chapter 11 debtors to be able to "strip down" a home mortgage when the Supreme Court has held that it is prohibited in Chapter 7 and Chapter 13 cases.