**In re ELMIRA LITHO, INC.,
et al., Debtors.**

**Bankruptcy Nos. 94 B 40247 (SMB)
to 94 B 40253 (SMB).**

United States Bankruptcy Court,
S.D. New York.

Nov. 17, 1994.

As Corrected Nov. 28, 1994.

Baer Marks & Upham (Larry D. Henin, Bruce Zabarauskas, Frank G. Cernigliaro, of counsel), New York City, for debtors.

O'Sullivan Graev & Karabell (Charles E. Bachman, Stewart A. Kagan, Joshua H. Epstein, of counsel), New York City, for U.S. Concord, Inc.

Duane Morris & Heckscher (James L. Allison, of counsel), Philadelphia, PA, for First Fidelity Bank, N.A.

Platzer, Fineberg & Swergold (Steven D. Karlin, of counsel), New York City, for Official Committee of Unsecured Creditors.

## MEMORANDUM DECISION DISMISSING APPLICATION FOR RELIEF FROM THE AUTOMATIC STAY

STUART M. BERNSTEIN, Bankruptcy Judge.

■ On October 26th and October 27th, 1994, the Court received evidence and heard argument in connection with U.S. Concord's ("Concord") application for relief from the automatic stay, or in the alternative, adequate protection. At the conclusion of Concord's direct case, the Court granted the Debtors' motion to dismiss the application pursuant to Fed.R.Civ.P. 52(c) for failure to establish a *prima facie* case. The Court concluded that a secured equipment lender who seeks relief from the automatic stay based upon a lack of adequate protection does not establish its *prima facie* case, merely by showing that the debtor is using its equipment if, during the case, it has received substantial payments on account of its lien. Instead, the secured creditor must demonstrate quantitatively that its collateral is declining in value at a faster rate than it has or will be compensated. The purpose of this memorandum is to amplify the Court's reasoning.

### FACTS

The Debtors filed their voluntary petitions under Chapter 11 on January 19, 1994, and have been procedurally consolidated. The Debtors are an affiliated group of privately owned corporations engaged in the integrated graphic communication and printing business. They use printing presses and other printing-related equipment in connection with their business.

Concord provided much of the financing that the Debtors used to acquire their equipment. Concord holds security interests in the equipment it financed, and pursuant to certain subsequent agreements that the Debtors challenge, cross-collateralized a portion of the acquisition debts with secured guarantees or assumptions of indebtedness given by non-acquiring Debtors. Concord contends that its aggregate claim against the Debtors exceeds $20,000,000.00.

Approximately two months into the case, Concord moved for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (d)(2), or in the alternative, for an order directing the Debtors to furnish adequate protection under 11 U.S.C. § 363(e). The Debtors strenuously opposed the motion on a variety of grounds that the Court need not discuss for the purposes of this decision. Notwithstanding this dispute, however, the Debtors made substantial payments to Concord on account of its lien during the pendency of Concord's motion. Pursuant to a Stipulation Adjourning Hearing on Motion of U.S. Concord, Inc., approved and signed by the Court on July 15, 1994, as modified on the record in open Court on that same date (see Transcript of Hearing, held July 15, 1994, at pp. 8–9, 14), the Court authorized the Debtors to make, and it appears to be undisputed that they actually made, adequate protection payments aggregating $130,000.00.

The Debtors made an additional payment and Concord received additional protection in connection with the sale of the assets of the Debtor, Imtech Graphics, Inc. ("Imtech"). By Consent Order, filed July 6, 1994, Imtech sold substantially all of its assets to Cordovano Graphics. Concord initially objected to the proposed sale, which included assets collateralizing the Debtors' obligation, but eventually joined in the Consent Order. Under the Consent Order, the Court authorized and directed Imtech to pay Concord $20,000.00 from the sale proceeds, and Cordovano assumed Imtech's obligation to Concord under a promissory note which, according to Concord's proof of claim, bore an outstanding balance of $244,534.59 as of the January 19, 1994 petition date. Further, according to Concord's Reply, dated June 29, 1994, at ¶ 8, submitted in connection with its motion, the value of the Imtech collateral was $275,000.00. In short, during the Chapter 11 case, the Debtors paid Concord $150,000.00, and with Concord's permission, a different—

and presumably, a more solvent—entity assumed Imtech's obligation to satisfy Concord's oversecured claim against Imtech.

At the evidentiary hearing, Concord relied upon documentary evidence to prove the amount of its claim and the validity of its security agreement. It offered into evidence its proof of claim in the sum of $20,010,-328.81. The proof of claim attached a schedule of the security agreements, the UCC filings, and an identification of the specific collateral, and referred the Court to two voluminous compendia, filed in connection with its relief from stay motion, for the actual security and perfection documentation. The Court admitted the compendia over the Debtors' objection.

Concord called an "expert" to testify regarding the value of the collateral and the decline in that value. James Engel, an employee of Profit Printing Machinery, was initially qualified to offer expert testimony based upon his years of experience buying and selling—privately and at public auction—printing equipment similar to the Debtors'. He valued the property under what he characterized as a "fair market value" approach and a "forced liquidation" approach. In forming his opinions, Mr. Engel relied primarily on his many years of experience described above, as well as on what he observed during his brief visits to the Debtors' three facilities.[1]

Mr. Engel identified several factors that he considered important in valuing equipment. These included the age, maintenance, obsolescence, configuration, and other possible uses of the machinery. He opined that the fair market value of all of the Debtors' equipment was $17 million, and ascribed a fair market value of $11 million to the Concord collateral.

Mr. Engel also rendered an opinion regarding the equipment's forced liquidation value, based primarily upon his attendance at public auctions. He opined that all of the Debtors' equipment was worth $16 million at liquidation, or only $1 million less than the fair market value, and that Concord's collateral was worth $10 million at liquidation, or only $1 million less than its fair market value.

Finally, Mr. Engel testified regarding the rate at which the collateral was declining in value. In his opinion, several factors dictated the rate of decline, including the age, condition, obsolescence and replacement value of the equipment. He stated that the value of Debtors' equipment declined at an overall annual rate of 7%, and that this translated into a $55,000.00 monthly decline in the value of Concord's collateral.

The Debtors' cross-examination of Mr. Engel raised questions regarding his qualifications and his opinions. He was never educated, certified or trained as an appraiser, was not familiar with appraisal techniques and had never taken appraisal courses. He could not define "going concern value" or "discount rate", two important concepts in the area of property valuation.

Some of his testimony also appeared to contradict itself. For example, he testified that "demand" affects the rate of depreciation, and although the supply has not changed, the demand for at least some of the Debtors' equipment is higher today than it was twelve months ago. He then said that even though the depreciation rate was related to the market demand for machinery, he had not considered market demand in computing the rate of decline.

In addition, only $1 million separated Mr. Engel's opinion regarding the fair market value and the liquidation value of all of the Debtors' equipment as well as Concord's collateral. Thus, the liquidation value of the Debtors' equipment and Concord's collateral represented approximately 94% and 91%, respectively, of the fair market value. The close proximity of the two values defies common sense and experience.

The Supreme Court recently addressed this very issue in *BFP v. Resolution Trust. Corp.*, —— U.S. ——, 114 S.Ct. 1757, 128

---

1. Mr. Engel visited each of the Debtors' three facilities for about 90 minutes each. He spent part of this time inspecting the equipment to determine how easily it could be removed. This aspect of his inspection concerned the separate issue, raised by the Debtors, that the equipment actually constituted "fixtures" as to which Concord did not hold a valid secured claim.

L.Ed.2d 556 (1994). Discussing the distinction between "fair market value" [2] and the "forced-sale value" that one would expect to realize at a foreclosure sale, the Supreme Court stated:

> [M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value.... In short, "fair market value" presumes market conditions that, by definition, do not obtain in the context of a forced sale.

—— U.S. at ——, 114 S.Ct. at 1761 (emphasis in original).

■ The Supreme Court's reasoning applies equally to the relationship between the fair market value and forced liquidation value of the Debtors' equipment and Concord's collateral. While the Court cannot draw a bright line and establish a concrete ratio between fair market and liquidation value, the two are rarely, if ever, as close as Mr. Engel opined. The virtual identity of such disparate values renders his opinion suspect.

■ Mr. Engel's methodology—and hence, his opinion—was also substantially undercut by an appraisal that Concord previously submitted in connection with this same motion. The appraisal, dated June 29, 1994, prepared by Marshall and Stevens (the "Marshall Appraisal") [3], was not admitted into evidence because no witness was present to authenticate it or submit to cross-examination regarding its contents. Nevertheless, the Court considered the Marshall Appraisal as an admission against Concord. *See Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 633–34 (2d Cir.1994).

The Marshall Appraisal identified "three distinct standard approaches which may be employed in developing an opinion of Fair Market Value." (Marshall Appraisal at p. 4). The Market Approach attempts to estimate value from the prices paid in actual market transactions and from asking prices from similar properties, but is inapplicable unless "there are sufficient sales of similar properties to establish a market." (*Id.*). The Income Approach discounts cash flows to present value, discounts the residual value of the equipment to a present value, and adds the results together to yield an aggregate value. (*Id.* at pp. 4–5). Finally, the Cost Approach considers the cost of reproducing the property. To determine the value of used equipment under this approach, the appraiser first estimates the cost of reproducing new equipment, and then deducts depreciation. (*Id.* at p. 5).

Mr. Engel did not follow any of the methodologies described in the Marshall Appraisal. Instead, he took a "seat of the pants" approach in which he considered his own factors described above. Further, it does not appear that he weighed the factors in any particular manner, and hence, it is not clear how he considered these factors in coming to a value determination.

Mr. Engel also admitted that he had no experience buying or selling some of the Debtors' largest and most valuable pieces of equipment. These included the Heidelberg/Harris M–1000BE press, which the Marshall Appraisal valued at $3,220,000.00, and the Heidelberg/Harris M–110C press, which the Marshall Appraisal valued at $2,760,000.00.[4]

In addition, he relied on arguably dated information obtained through his personal involvement in the sale of an M–1000B nine

---

**2.** The Supreme Court adopted the definition of "market value" contained in Black's Law Dictionary 971 (6th ed. 1990), *see* —— U.S. at ——, 114 S.Ct. at 1761, which is substantially the same as the definition of "fair market value" that Mr. Engel offered during his testimony: the price that would be fixed through negotiation and mutual agreement between a willing buyer who is not compelled to buy and a willing seller who is not compelled to sell.

**3.** The Marshall Appraisal was apparently performed, or at least supervised, by David Love.

His professional qualifications are set forth in the Marshall Appraisal, and indicate that he has substantial experience appraising property since 1967.

**4.** Mr. Engel appraised these presses during his relatively brief walk-through of the plant in East Rutherford, New Jersey. He ascribed fair market values of $3 million and $2.4 million, respectively, to the M–1000BE press (which his written summary identifies as an M–1000B model), and the M–110C press.

months earlier.[5] Two such presses, on which Concord holds second liens, sit in the Elmira Litho plant located at Horseheads, New York. The Marshall Report appraised the two presses at an aggregate value of $5,750,-000.00; Mr. Engel's value was nearly $2 million less.

The Marshall Appraisal also contradicted, to some extent, Concord's contention, and Mr. Engel's testimony, that the collateral was declining in value. It identified certain items of equipment which, in its opinion, would not decline over the next twelve month period. These included the Harris M–1000 and the M–1000 A Presses, the Mitsubishi Press, the Muller Martini Saddle Stitchers, the Stahl Folders and the Misomex Auto Strippers.

The Court ultimately concluded that while Mr. Engel was forthright, honest, and had testified in good faith, he lacked the expertise to render opinions regarding the value of the Debtors' equipment or Concord's collateral, or the rate at which either value was declining. Having discounted his testimony entirely, the Court granted the Debtors' motion to dismiss the application at the conclusion of Concord's case. The Court's reasoning, explained at the conclusion of the hearing, is amplified below.

## DISCUSSION

### A. Introduction

Section 362 of the Bankruptcy Code governs motions for relief from the automatic stay. Section 362(d), which sets forth the grounds for granting relief, provides:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—

> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization.

■ Sections 362(d)(1) and (d)(2) are disjunctive. This means that the Court must lift the stay if the movant prevails under either of the two grounds. *In re Touloumis,* 170 B.R. 825, 827 (Bankr.S.D.N.Y.1994); *In re de Kleinman,* 156 B.R. 131, 136 (Bankr. S.D.N.Y.1993); *In re Diplomat Electronics Corp.,* 82 B.R. 688, 692 (Bankr.S.D.N.Y.1988).

Section 362(g) allocates the burden of proof on the motion. It provides:

> In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
>
> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
>
> (2) the party opposing such relief has the burden of proof on all other issues.

■ Section 362(g) speaks with seductive simplicity. Yet one considering the burden of proof must distinguish between the ultimate burden of persuasion (or the risk of non-persuasion) and the initial burden of going forward. As discussed below, the two are distinct, and a party can bear the initial burden of going forward even if it does not bear the ultimate burden of persuasion. If it fails to carry its initial burden, the Court will dismiss its application without requiring the party that bears the ultimate burden of persuasion to offer any evidence.

### B. Concord's Claim Under § 362(d)(2)

■ The secured creditor who seeks relief from the automatic stay under § 362(d)(2) must demonstrate (1) the amount of its claim, (2) that its claim is secured by a valid, perfected lien in property of the estate, and (3) that the debtor lacks equity in the property. *First Agricultural Bank v. Jug End in the Berkshires, Inc. (In re Jug End in the Berkshires, Inc.),* 46 B.R. 892, 901

---

5. As already stated, Mr. Engel testified that the demand for some of the Debtors' equipment had actually increased during the preceding twelve months.

(Bankr.D.Mass.1985); *In re Keller*, 45 B.R. 469, 471 (Bankr.D.Iowa 1984). Under § 362(d)(2), "equity" means the difference between the value of the property and the total amount of claims that it secures.[6] *In re de Kleinman*, 156 B.R. at 136; *In re Diplomat Electronics Corp.*, 82 B.R. at 692. Once the movant establishes its *prima facie* case, the burden shifts to the debtor to show that the property is necessary for an effective reorganization.[7]

To establish the amount of its claim and the validity and perfection of its security interest, Concord relied upon its proof of claim together with certain documentation that the claim identified but did not attach. Rule 3001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule") governs the content and evidentiary effect of proofs of claim. Where a claim is based on writing, the writing must be attached, but if it is lost or destroyed, the claimant must provide a statement with the claim explaining the loss or destruction. Bankruptcy Rule 3001(c). If the claim is perfected, the proof of claim must also attach evidence of perfection. *Id.* 3001(d).

 A duly executed and filed proof of claim "shall constitute *prima facie* evidence of the validity and amount of the claim." *Id.* 3001(f). This rule supplements the Federal Rules of Evidence. 8 L. King, et al., *Collier on Bankruptcy* ¶ 3001.05, 3001–27 (15th ed. 1994) ("Collier"). To establish a *prima facie* case of a perfected security interest, and consistent with Bankruptcy Rule 3001(d), the claimant must file its documentation evidencing perfection together with the claim. *In re Stoecker*, 1992 WL 132566, at *3 (Bankr.N.D.Ill., May 26, 1992)[8]. Where the perfection documentation is voluminous and not attached, the creditor nevertheless satisfies the requirements of Bankruptcy Rule 3001—and establishes the *prima facie* validity of its security interest—by stating in the proof of claim that the documentation is voluminous and is available on request, and the claim establishes a reasonable basis for the claim. *See In re Klein*, 119 B.R. 971, 980–81 (N.D.Ill.1990), *appeal dismissed*, 940 F.2d 1075 (7th Cir.1991).

 Concord's proof of claim meets these standards, and, therefore, establishes the *prima facie* validity of its secured claim—including perfection. Concord's claim is duly executed, and states that the Debtors owe Concord a secured debt of $20,010,238.81. The claim appends a schedule, broken down by each Debtor-obligor, identifying the relevant document of indebtedness, security agreements, collateral and UCC filings with sufficient specificity to enable any party, armed with the proof of claim, to request the appropriate documents from the particular Debtor, and in the case of the UCC financing statements, to confirm the filing. In addition, a footnote on the first page of the schedule states that the original supporting documentation is voluminous, and a complete set is on file with the Bankruptcy Court in connection with Concord's March 14, 1994 motion for relief from the automatic stay, or alternatively, for an order granting adequate protection.

 The receipt into evidence of Concord's proof of claim and the related documentation satisfied its initial burden of showing that it held a valid, perfected secured claim. The rejection of Mr. Engel's testimony, however, laid to permanent rest Concord's § 362(d)(2) application. Concord did not offer any other evidence of the value of its collateral or other liens that it secured, and without it, there was no evidence in the

---

6. The debtor's "lack of equity" should not be confused with the lack of an "equity cushion", a related but not identical concept. The distinction is discussed below.

7. The burden also shifts to the debtor to controvert the movant's *prima facie* case. If the debtor can carry its burden of going forward with evidence that the movant does not have a secured claim, or that the debtor does not lack equity in the property, the burden then shifts back to the movant on these issues. If the movant does not satisfy its ultimate burden of persuasion on these issues, the Court must deny the motion under § 362(d)(2) without regard to whether the property is necessary for an effective reorganization.

8. The Debtor's acknowledgement of a valid security interest in its petition or schedules can also constitute *prima facie* evidence of this element. *See In re Wolsky*, 53 B.R. 751, 757 (Bankr.D.N.D. 1985).

record to show that the Debtors lacked equity in the property. For this reason, the Court granted the Debtors' motion to dismiss the § 362(d)(2) claim at the close of Concord's direct case.

## C. Concord's Claim Under § 362(d)(1)

### 1. The Elements of the *Prima Facie* Case

■ The proof required to establish a *prima facie* case under 11 U.S.C. § 362(d)(1) is less apparent. Section 362(g)(2) places squarely on the debtor's shoulders the burden of proving the absence of cause, and cause includes lack of adequate protection. This, in turn, suggests that the secured creditor need only show that it holds a secured claim, as it would under § 362(d)(2), in order to establish a *prima facie* case, whereupon the burden shifts to the debtor to disprove that cause exists for relief from the automatic stay.

■ Although, as noted in *In re Planned Sys., Inc.*, 78 B.R. 852, 859 (Bankr.S.D.Ohio 1987), a few courts have held secured creditors to this minimal burden, *see e.g., In re Playa Development Corp.*, 68 B.R. 549, 553 (Bankr.W.D.Tex.1986), these decisions ignore the requirement that as part of the *prima facie* case, the movant must demonstrate a factual and legal right to the relief that it seeks. *See In re Planned Sys.*, 78 B.R. at 859. Thus, every party seeking relief from the automatic stay under § 362(d)(1) must carry the initial burden of showing that it is entitled to relief before the debtor is obligated to go forward with its proof. *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1285 (2d Cir.1990); *In re Keene Corp.*, 171 B.R. 180, 182 (Bankr.S.D.N.Y. 1994).

■ If the basis of the stay relief is lack of adequate protection of an interest in property, the nature of the movant's interest defines the need for adequate protection, and the scope of the *prima facie* case. In *United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370, 108 S.Ct.

626, 630, 98 L.Ed.2d 740 (1988), the Supreme Court defined the nature of the secured creditor's interest and the extent of the adequate protection that § 362(d)(1) addresses:

> It is common ground that the "interest in property" referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay.

*Accord, Barclays Bank of New York, N.A. v. Saypol (In re Saypol)*, 31 B.R. 796, 800 (Bankr.S.D.N.Y.1983) ("In the context of the automatic stay, Congress believed the existence *vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

■ Accordingly, the secured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay. It must, therefore, prove this decline in value—or the threat of a decline [9]—in order to establish a *prima facie* case. *See, e.g., In re Sun Valley Ranches, Inc.*, 823 F.2d 1373, 1376 (9th Cir.1987); *In re Marion Street Partnership*, 108 B.R. 218, 225 (Bankr. D.Minn.1989); *In re Raymond*, 99 B.R. 819, 821–22 (Bankr.S.D.Ohio 1989); *In re Planned Sys., Inc.*, 78 B.R. at 862–63; *In re Borchers*, 45 B.R. 69, 72 (Bankr.D.Iowa 1984); *In re Irving A. Horns Farms Inc.*, 42 B.R. 832, 837 (Bankr.D.Iowa 1984).

■ Once the movant satisfies this initial burden, the burden shifts to the debtor to go forward with evidence, and ultimately, to prove that the collateral is not declining in value, or that the secured party is adequately protected through periodic payments, an equity cushion, additional or replacement liens or good prospects for a successful reorganization. *In re Hinchliffe*, 164 B.R. 45, 49 (Bankr.E.D.Pa.1994); *see In re Blackwell*, 162 B.R. 117, 120 (E.D.Pa.1993) (once the mortgagee makes out a *prima facie* case, the burden shifts to the debtor to prove that an equity cushion adequately protects the mov-

---

**9.** Such "threats" include the failure to maintain property insurance or the failure to keep the property in a good state of repair. *See In re Brown*, 78 B.R. 499, 503 (Bankr.S.D.Ohio 1987).

ant's interest); *In re Dacon Bolingbrook Associates, L.P.,* 153 B.R. 204, 208 (N.D.Ill. 1993) (once movant established *prima facie* case by establishing debtor's continued failure to make periodic payments, burden shifted to debtor to demonstrate existence of adequate protection for any significant diminution in value of collateral); *In re Ocasio,* 97 B.R. 825, 826 (Bankr.E.D.Pa.1989) (after movant established *prima facie* case and shifted burden of proof to the debtor, the debtor failed to meet her burden of proving that a substantial equity cushion provided adequate protection); *Fidelity Bond & Mortgage Co. v. Britton (In re Britton ),* 9 B.R. 245, 247–48 (Bankr.E.D.Pa.1981) (same); *cf. Delaware Valley Savings & Loan Ass'n v. Curtis (In re Curtis ),* 9 B.R. 110, 112 (Bankr.E.D.Pa.1981) (despite debtor's failure to make mortgage payments, mortgagee was adequately protected through substantial equity cushion).

▆▆▆ The most persuasive proof of declining value is *quantitative.* It comes from appraisal or similar evidence showing that the collateral at the beginning of the case was worth more than at the date of the hearing, or more generally, that it was worth more at an earlier date than it is or will be worth at some future date. Alternatively, a secured creditor can adduce evidence of declining value through proof of the marginal or periodic rate of decline during the post-petition period, without regard to the absolute values at the beginning of the case and the present time. Concord attempted to follow this approach by eliciting testimony from Mr. Engel that Concord's collateral declined in value at the rate of 7%, or $55,000.00 per month.

▆▆▆ A secured creditor can sometimes prove its case *qualitatively.* Without quantifying the decline in value, the creditor can often establish its *prima facie* case by demonstrating that the debtor has completely failed, or substantially failed, to make post-petition payments. *See, e.g., In re Dacon Bolingbrook Associates,* 153 B.R. at 208 (continued failure to tender periodic payments); *In re Blackwell,* 162 B.R. at 120 (debtor made only eight post-petition mortgage payments in three years); *In re Hinchliffe,* 164

B.R. at 49 (failure to make any post-petition payments); *In re Ocasio,* 97 B.R. at 826 (same); *Provident Mutual Life Ins. Co. v. Winslow Center Associates (In re Winslow Center Associates ),* 32 B.R. 685, 687 (Bankr. E.D.Pa.1983) (failure to make monthly mortgage and tax payments); *cf. In re Taylor,* 151 B.R. 646, 648 (E.D.N.Y.1993) (failure to make post-Chapter 11 confirmation mortgage payments constituted cause). *But cf. In re Elmore,* 94 B.R. 670, 677 (Bankr.C.D.Cal. 1988) (in light of *Timbers,* default under Chapter 13 plan does not entitle secured creditor to relief from stay in the absence of proof of declining value of collateral).

▆▆▆ This approach does not quantify the decline in value, and the force of the proof depends on the strength of the inference that the value of the debtor's property declines over time. This approach may have appeal if the debtor uses the secured creditor's property during the case, but makes no post-petition payments. It loses any force, however, if the undisputed proof shows that the debtor has made substantial post-petition payments.

**2. The Materiality of an Equity Cushion**

▆▆▆ The proof necessary to satisfy the movant's initial burden is further clouded by those cases that have held that a secured creditor establishes a *prima facie* case by showing that it lacks an equity cushion. *E.g., In re Morysville Body Works, Inc.,* 86 B.R. 51, 56 (Bankr.E.D.Pa.1988) (when movant seeks relief from stay on the ground that no equity cushion exists, and debtor concedes absence of equity cushion, movant establishes *prima facie* case); *In re Jug End in the Berkshires, Inc.,* 46 B.R. at 900 (movant satisfied *prima facie* case under § 362(d)(1) by proving inadequate equity cushion); *Continental Bank v. Bobroff (In re Bobroff ),* 32 B.R. 930, 931 (Bankr.E.D.Pa.1983) (same); *Clark Equipment Credit Corp. v. Kane (In re Kane),* 27 B.R. 902, 905 (Bankr.M.D.Pa.1983) (party that predicates § 362(d)(1) motion on the debtor's lack of equity bears the burden of proof on the issue of equity due to § 362(g)); *see In re Brown,* 78 B.R. at 503 (movant failed to establish *prima facie* case

because it did not offer any evidence of lack of equity, depreciating collateral, non-payment of taxes, failure to insure property, failure to maintain property in good repair, "or any other facts tending to evidence lack of adequate protection"). One of the leading bankruptcy commentators has even suggested, albeit without citation to authority, that the secured creditor who raises lack of adequate protection will "often" have to prove "lack of equity" as part of its *prima facie* case under § 362(d)(1). 2 *Collier* ¶ 362.10, at pp. 362–83.

The problem with the equity cushion cases is that they ignore the definitional relationship between decline in value and lack of adequate protection, and confuse the related concepts of the debtor's lack of equity in the collateral and the absence of an equity cushion in the collateral. As a result, they misconstrue the relative burdens of proof.

It is beyond cavil that an equity cushion can, under certain circumstances, serve as a form of adequate protection. The *Timbers* Court recognized that the "interest in property" entitled to adequate protection "includes the right of the secured creditor to have the security applied in payment of the debt upon the completion of the reorganization." 484 U.S. at 370, 108 S.Ct. at 630. An equity cushion, therefore, provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case.

■ It does not follow, however, that the existence or the absence of an equity cushion is material to the secured creditor's *prima facie* case. Logically, the existence or absence of an equity cushion does not support the inference that the collateral is declining in value. *See In re Planned Sys.*, 78 B.R. at 862 ("the existence or non-existence of equity should not be the *sine qua non* for adequate protection") (footnote omitted). The only significance of the absence of an equity cushion is that if the collateral is *also* declining in value, it is more likely than not that the secured creditor is being injured by the continuation of the stay. The relevant inquiry remains, however, whether the property is declining in value.

■ Further, § 362(g)(1) does not require the secured creditor to prove lack of equity as part of its § 362(d)(1) motion for relief from the stay based on a lack of adequate protection. The debtor's lack of equity is an element of a § 362(d)(2) motion, and § 362(g)(1) places on the movant the "burden of proof on the issue of the debtor's equity in the property." The debtor's lack of equity is immaterial to the secured creditor's case under § 362(d)(1), and if the debtor raises the existence of an equity cushion to demonstrate adequate protection, the debtor—not the secured creditor—must prove it notwithstanding the provisions of § 362(g). *See In re Gauvin*, 24 B.R. 578, 580 (Bankr. 9th Cir.1982); *see generally* 1 J. Queenan, et al., *Chapter 11 Theory & Practice: A Guide to Reorganization* § 8:18, at p. 8:75 (1994) ("Queenan").

■ This apparent anomaly arises from the distinction between the debtor's equity—the difference between the value of the property and all the liens that it secures—and an equity cushion, the amount of collateral available to satisfy a secured creditor's claim. Unlike the issue of equity under § 362(d)(2), which concerns the *debtor's* interest in the collateral, the equity cushion under § 362(d)(1) ignores junior liens and focuses on the *creditor's* interest in the collateral. *In re Hinchliffe*, 164 B.R. at 51; *In re Colonial Center, Inc.*, 156 B.R. 452, 460 (Bankr. E.D.Pa.1993); *In re Morysville Body Works, Inc.*, 86 B.R. at 56 n. 8; *In re Jug End in the Berkshires, Inc.*, 46 B.R. at 899; *see generally* 1 Queenan § 8:18, at p. 8:75. Thus, although a debtor may lack equity in its property, a senior lienor may nonetheless enjoy a substantial equity cushion in that property.

■ Finally, requiring the secured creditor to prove the absence of an equity cushion as part of its affirmative case for relief from the stay under § 362(d)(1) can lead to inconsistent results. Concord moved in the alternative for adequate protection under § 363(e) which authorizes the Court, on request of an entity with an interest in property, to condition the debtor's use of the property "as is necessary to provide adequate protection of such interest." "The request contemplated

by § 363(e) is typically made pursuant to § 362(d)," *In re Raymond,* 99 B.R. at 820, and "adequate protection" under sections 362 and 363 means the same. *In re McCombs Properties VI, Ltd.,* 88 B.R. 261, 266 (Bankr. C.D.Cal.1988).

 The burden of proof on a motion under § 363(e) is governed by § 363(*o* )[10]. Section 363(*o* ) does not mention or require proof of equity or an equity cushion. Instead, it requires the party asserting an interest in property to prove "the validity, priority, or extent of such interest," § 363(*o* )(2), and imposes on the trustee "the burden of proof on the issue of adequate protection." Section 363(*o* )(1).

If a movant had to prove the absence of an equity cushion under § 362 but not under § 363, its failure to do so could lead to collateral "gridlock". By proving declining value, the movant would be entitled to condition the use of its collateral on the providing of adequate protection under § 363(e). If the movant failed, however, to also demonstrate the absence of an equity cushion, it would not be entitled to relief from the stay to foreclose its security interest under § 362(d)(1). Under those circumstances, if the debtor did not provide adequate protection, it could not use the collateral, but the secured party could not take steps to recover it.

### 3. Concord's *Prima Facie* Case

 Without Mr. Engel's testimony, Concord's *prima facie* case under § 362(d)(1) consisted of two items of proof—the inference arising from the Debtors' use of Concord's collateral, and the Debtors' deducting depreciation and amortization expenses for their equipment and intangible assets at a current monthly rate of $404,672.00. The Debtors' use of the collateral does not support the inference that Concord's interest in the collateral is deteriorating as a result of the stay because the Debtors also paid Concord $150,000.00 during the post-petition pe-

riod. In addition, a third party assumed a small portion of the total debt.

 Further, depreciation expenses taken for tax or other purposes do not constitute evidence that the collateral is declining in value. Conversely, fully depreciated assets may continue to decline in value. Depreciation is an accounting concept that does not necessarily correspond to the actual diminution in value:

> "[A]s a matter of accounting theory, depreciation is simply an accounting devise intended to allocate the cost of using an asset to the periods in which that use contributes to revenue by approximating the gradual diminution in value of the asset over time due to age, wear and tear, and obsolescence." *Hawkins v. C.I.R.,* 713 F.2d 347, 351 (8th Cir.1983). "[D]epreciation is a process of estimated allocation which does not take account of fluctuation in valuation through market appreciation." *Fribourg Navigation Co. v. C.I.R.,* 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966).

*Williams v. L & S Industries, Inc. (In re L & S Industries, Inc.),* 60 B.R. 937, 942 (Bankr.N.D.Ill.1986).

An entity can select among several depreciation methods, and its choice frequently depends upon tax considerations rather than the effect of time on market value. The most common method, straight-line depreciation, is uniform over time. J. Alix, et al., *Financial Handbook for Bankruptcy Professionals* § 9.25 at 377 (1991). Alternatively, the entity can select an accelerated depreciation method that permits greater depreciation deductions in earlier years. *Id.* Or the entity can select one method for financial reporting and the other for tax accounting. *Id.* at 377–78.

 In the circumstances of this case, Concord failed to demonstrate a correlation between the amount of depreciation that the Debtors deducted for tax and accounting purposes, and the actual decline in the mar-

---

**10.** Section 363(*o* ) was added to the Bankruptcy Code in 1984. It is derived from § 363(e) which, prior to 1984, dealt with the allocation of the burden of proof simply by stating that the trustee had the burden of proof on the issue of adequate protection. There is no legislative history accompanying its enactment or explaining its relationship to § 362(g). Nevertheless, sections 362(g) and 363(*o* ) should be read *in pari materia,* and construed together.

ket value of its collateral. Concord never identified the Debtors' method for deducting depreciation. Indeed, Concord never proved the amount of depreciation that the Debtors deducted on account of its collateral. The amount of $404,672.00 which was identified at trial referred to the aggregate of the depreciation deduction for all of the Debtors' equipment and the amortization deduction for their intangible assets. Concord's proof did not separate out the components of this aggregate expense.

In addition, the record contains evidence that the Debtors' depreciation deductions do not correlate to the actual movement in market value. First, Mr. Engel testified that demand was increasing for certain of the Debtors' equipment. The depreciation deduction would not reflect the effect of increased demand on the market value of the property. Second, the Marshall Report indicated that certain of the collateral would not decline in value. Although such equipment may be depreciable for accounting purposes, it is not declining in value. When one adds to the equation that the Debtors paid $150,-000.00 to Concord during the post-petition period, the conclusion follows that Concord failed to establish on its direct case that the net value of its collateral had declined or would decline during the period of the automatic stay.

The Court is simultaneously executing a separate order consistent with this opinion.