**In re Karen de KLEINMAN.**

**No. 95 Civ. 0165 (RO).**

United States District Court,
S.D. New York.

April 9, 1996.

**25**

Karen de Kleinman, Pro Se.

Togut, Segal & Segal, New York City, for Trustee Neil Berger.

Albert Togut, Trustee.

## OPINION AND ORDER

OWEN, District Judge.

On April 29, 1991, Karen de Kleinman, a licensed real-estate broker,[1] filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and thereby obtained a stay of creditors' efforts against her, the causes of which are detailed hereafter. The case was originally assigned to Bankruptcy Judge Prudence Abram.

At that time Debtor de Kleinman resided in an apartment at the Olympic Tower at 641 Fifth Avenue, New York, New York, valued in the area of $1,000,000. She did not own the apartment, but occupied it as an "equitable beneficiary" pursuant to a questionable transaction with the prior owner. She also was the owner of a second similar apartment at the said Olympic Tower, and a less valuable cooperative apartment at 185 West End Avenue, New York, New York.

Bankruptcy Judge Abram in 1993 described the first two years of this case as follows:[2]

> The debtors in these Chapter 11 cases are mother [Karen de Kleinman, the Debtor] and daughter [a debtor in a separate proceeding pending in the Bankruptcy Court].

Both pre- and post-petition the mother has attempted to fend off foreclosure of her interest in various apartments located in New York City through prolific litigation which the mother has stated has all but consumed her life. This matter appears to be a garden variety motion to lift the automatic stay to permit foreclosure of a lien on a residential cooperative apartment. In another case, the matter would have long ago been resolved. However the mother has undertaken to embark on a scorched earth campaign of litigation, including making numerous attacks on the court's integrity.[3] As soon as this court has heard and rendered a decision on one matter in these cases, the mother has filed motions for reargument, appeals, and even a corporate bankruptcy case.[4] What taken individually could be viewed as a reasonable exercise of right, taken collectively, reflects an abject unwillingness to be bound by the rulings of any court, if she deems these rulings to be adverse to her.

De Kleinman, through these efforts managed to continue as a debtor-in-possession under Chapter 11 for approximately 31 months until a Conversion Order was entered in November 1993 converting the proceeding to one under Chapter 7 of the Bankruptcy Code. No Plan of Reorganization or Disclosure Statement had ever been filed in the 31 months prior to the Conversion Date. At that time Albert Togut was named, and is today, the Trustee of de Kleinman's estate. A few days later, on December 9, 1993, this case was assigned to Bankruptcy Judge Stuart M. Bernstein, where it remains.

As de Kleinman's original and amended schedules and the legal docket maintained by the Clerk of the Court for this case reveal, her affairs were somewhat complex. At an

---

1. She operated her real estate business through her wholly owned corporation, Apartment Locating, Inc.

2. *In re de Kleinman,* 156 B.R. 131, 132 (Bankr. S.D.N.Y.1993).

3. [Footnote by the Court]. These attacks have been continuous to this day, and now have as targets District Judges and Judges of the Court of Appeals.

4. [Footnote by the Court]. When a lifting of the automatic stay of foreclosure on her apartments to permit their sale occurred in early May 1992, she created an interest in the apartments in her corporation, Apartment Locating, Inc. for a nominal consideration, and then the next day put that corporation in bankruptcy to further delay the process. And *see* fn. 15 reciting that she sought leave to permit the corporation to appeal without the requirement of counsel.

early statutorily required meeting, she was examined at length concerning her financial affairs including her prior ownership of various apartments, numerous claims she asserted in various courts, and her interests in insurance claims and corporate entities. Meaningful responses were, however, not obtained and the meeting was adjourned to further investigate her affairs. Further efforts to gain relevant information came to naught.

As the Bankruptcy Court's and District Court's dockets reveal, Debtor de Kleinman has, throughout the course of this case, appealed from virtually every order entered by the Bankruptcy Court, even from a ministerial act of one of its clerks, and from many actions taken by the attorneys, the Trustee, and by many other third-party participants in this case. She then endeavored to use these appeals as the basis of contesting the jurisdiction for, and consequent lack of enforceability of, subsequent orders of the Bankruptcy Court and this Court. Accordingly, her response to virtually every order over four years has been that she need not respond to the order because it is "void ab initio." She summed this up succinctly in her final lengthy address to this Court on the very last hearing on March 28, 1996:

> [Citibank's] motion to lift the automatic stay ... was null, void ab initio ... for a lack of the lower court's subject matter jurisdiction.

> \*    \*    \*    \*    \*    \*

> The conversion order is likewise void ab initio because Olympic Tower has no claim in these proceedings and could not move to convert because they are not a party in interest under any shape or imagination of any judge.

> \*    \*    \*    \*    \*    \*

[E]verything is null, void ab initio and of no legal effect.

This obviously impeded, if not virtually stymied, the Trustee's ability to administer the estate and to effectively investigate her financial affairs. He eventually sought an order of the Bankruptcy Court to compel the Debtor's cooperation, and on March 9, 1994, following a hearing attended by de Kleinman, the Bankruptcy Court issued an order which reads in pertinent part:

> ORDERED, that on or before March 31, 1994, the Debtor be, and she hereby is, directed to prepare and file a schedule of unpaid debts incurred during the superseded Chapter 11 case herein including: (1) the name and address of each creditor, (2) amount owed to each creditor, (3) the date that each debt was incurred by the Debtor, and (4) the consideration therefor; and to also file on or before March 31, 1994, a final report and account, all pursuant to Rule 1019 of the Bankruptcy Rules, ... a list identifying all claims and causes of action in favor of the Debtor ... [and she is to] provide to the Trustee ... all documents ... evidencing the Debtor's claims for damages arising from water damage to Apartment 39–E at the Olympic Tower, 641 Fifth Avenue, New York, New York, occurring in or about June 1992, ... [and] to surrender ... to the Trustee ... all of the shares of Apartment Locating, Inc., along with the stock transfer ledger maintained by Apartment Locating, Inc. [and] all pawn tickets and/or receipts evidencing the Debtor's pledge of any and all personal property....

On March 21, 1994, de Kleinman filed a Notice of Appeal from the above Compliance Order and the appeal was assigned to me. However, de Kleinman took no steps to perfect the appeal, and to this date that order has neither been amended nor stayed.[5] On May 25, 1994, de Kleinman was examined by the Trustee's attorneys at an adjourned

---

5. This was but one of at least 26 appeals to the District Court, each given a new index number with the Clerk's office setting up dockets. The said appeals were then randomly assigned to various judges of this Court. A number were acted upon and some dismissed for failure to prosecute. Upon later transfer to me of all of them remaining open, I observed from the docket sheets that 20 had never been perfected and *sua sponte* dismissed them. Those dismissals, I

am told are being appealed. The latter of these appeals are apparently procedurally insufficient as well, since as early as 1994, the Court of Appeals warned de Kleinman of the consequences of persisting in bringing frivolous actions. In dismissing such an appeal two years later on February 7, 1996, the Court concluded its summary order by stating:

> In light of de Kleinman's history of pursuing frivolous appeals and in accordance with this

§ 341 meeting. She acknowledged her receipt of the Compliance Order and her possession of the information, documents, and property required to have been surrendered to the Trustee, but refused to comply. The Trustee thereupon moved for an order holding her in civil contempt of the Compliance Order pursuant to Bankruptcy Rule 9020. At the hearing on the motion, the Bankruptcy Court asked de Kleinman whether she would comply with the Compliance Order, and after she answered in the negative, Bankruptcy Judge Bernstein entered an Order holding the Debtor in civil contempt for her failure and refusal to comply with and obey the Compliance Order. Pursuant to that order, de Kleinman was afforded an opportunity to purge herself of her contempt by performing under the Compliance Order within ten days, but if she persisted in refusing to obey the Compliance Order, the Debtor was to be incarcerated as a coercive civil contempt sanction to induce compliance.[6]

The Debtor's appeals from the Contempt Order were dismissed, and on August 11, 1994, at a hearing where de Kleinman again refused to comply with the Compliance Order, the Bankruptcy Court directed that she be taken into custody by marshals pursuant to the Contempt Order, and she was. However, during a second hearing approximately two hours later on the same day, attended by both the Debtor and counsel for the Trustee, the Bankruptcy Court ordered the Debtor's release from custody until it could ascertain whether a warrant for the Debtor's arrest had been issued. Subsequently, it was determined that a warrant for the Debtor's arrest had not been issued. The Debtor appealed these events all the way to the Court of Appeals which dismissed the appeal on October 7, 1994.

Because the Debtor had challenged the jurisdiction of the Bankruptcy Court to find her in civil contempt and to direct her incarceration, and because of a perceived issue as

to a Bankruptcy Judge's constitutional authority to order a debtor's incarceration, the Trustee obtained from the Bankruptcy Court a Certification of the Debtor's contempt to the District Court.

In its Certification, the Bankruptcy Court stated:

The Debtor deliberately and willfully failed to comply with the Bankruptcy Court's Compliance Order. The Debtor has not only refused the Trustee's requests for the specific property and information requested, but has refused the Bankruptcy Court's requests and orders as well. The Debtor has refused to succumb to the jurisdiction of the Bankruptcy Court and has been belligerent in her dealings with this Court.

Accordingly, I set up a hearing for March 24, 1995 and notified de Kleinman and other parties that its purpose was to consider whether matters raised in de Kleinman's papers in opposition were legally sufficient to avoid placing her in civil coercive incarceration for contempt. At that hearing at which the Debtor appeared *pro se* (*see* fn. 15 *infra*), for over two hours I conducted a *de novo* review of the Bankruptcy Court's Certification of the Debtor's civil contempt and the Debtor's numerous objections thereto. In the course of the hearing, I concluded notwithstanding her challenges, that the Conversion Order was valid, the Compliance Order was valid, and the appointment of the Trustee was valid.

At the conclusion of the hearing, I found Judge Bernstein's Compliance Order to have been violated and directed de Kleinman to be forthwith incarcerated in civil contempt until she complied with the order, thereby purging herself. She was put in civil detention in the Metropolitan Correctional Center (the "MCC"), appealed, and on May 11, 1995, the Second Circuit dismissed the appeal.

Court's prior warnings, it is further ordered that de Kleinman is required to seek leave of the court prior to filing any future appeals. De Kleinman's response when the ruling was read to her on March 28, 1996 was, "I'm so sorry, but that order is void, too. There was nothing pending before them. There was no

notice and there is no good cause. But we will let the Supreme Court decide all of that."

6. De Kleinman was appearing *pro se* through all this and I am not aware of any request of counsel. This is revealing as to a belated request of me toward the end of the March 28, 1996 proceeding. (*See* fn. 15 *infra*.)

Periodically thereafter, I had the Debtor before the Court to see if compliance was possibly forthcoming. The first time on June 5, 1995, after the Court of Appeals had dismissed her appeal, de Kleinman told me that she had no intention of complying, but instead would seek to have the Contempt Order overturned by the United States Supreme Court. Her time to file a petition for a writ of certiorari with the United States Supreme Court was to expire on July 27, 1995, but she had not yet filed.[7] However, it appears that while she sought and obtained an extension of time to file her petition until September 8, 1995, and sought a second 90–day extension, whatever further time was granted also expired with no filing on de Kleinman's part.

I had de Kleinman before me on January 25, 1996,[8] but she quickly became abusive and I had the marshals return her to the MCC, and continued the session in her absence. Trustee Togut conjectured as to de Kleinman's motivation for remaining in MCC, and what she might be hiding by non-compliance, alternatively voicing the suggestion that she might be "psychologically impaired". Following up on this, I again had de Kleinman before me on February 16, 1996 at which time I told her I had *sua sponte* appointed Dr. Naomi Goldstein,[9] a recognized expert in this field, to meet with de Kleinman—if de Kleinman consented to see her—and to read the transcripts before me and any other matters that were public record and could be furnished her, and report to the Court.[10] Dr. Goldstein met with her and spoke with her for some minutes [11] but de Kleinman did not meaningfully cooperate. Dr. Goldstein thereafter considered the other materials and reported to the Court as follows:

It is my professional opinion based on this limited contact, a review of the documents, and Ms. de Kleinman's testimony, that Ms. de Kleinman understands the nature of her legal situation, and is able to proceed in her own behalf. She is absolutely defiant and willful. I believe that Ms. de Kleinman is of the opinion that not only is the Order for evaluation an assault on her constitutional rights, but that the bankruptcy proceedings are also. In my opinion, Ms. de Kleinman can address the fundamental issues in the contempt proceedings if she wants to do so.

Finally, on March 28, 1996, I had de Kleinman again before me and stated:

Ms. de Kleinman, I am sure that you are aware that probably the reason for my convening today's proceedings is that it has been a year since you have been placed in civil contempt, and observing that you voluntarily sought out and went into bankruptcy, and that in that proceeding Judge Bernstein in the [B]ankruptcy [C]ourt on March 9, 1994 ordered that you produce a schedule of unpaid debts with the names and addresses of creditors and the amount owed to each, the dates the debts were incurred, consideration therefor, identify claims in favor of you, giving up documents evidencing a claim for damages from water damage to a certain apartment, and turn over all the shares of an apartment, which was your corporation, and that order having been out there for a year without compliance and then coming before me, and I ordering compliance on that on

---

7. De Kleinman told me she had 90 days to file her petition and was going to do so.

8. Judge Bernstein shared the bench with me so that he could—and did—treat part of the session as a Bankruptcy Court hearing.

9. I advised de Kleinman at that time that she did not have to speak with Dr. Goldstein if she chose not to, that she had Fifth Amendment rights, and might want to get a lawyer. She did not get a lawyer.

10. At that session I also took under advisement a motion by the Trustee, not relevant to these issues, as to which de Kleinman had *pro se* submitted papers in opposition. De Kleinman was at

the same time submitting opposition papers *pro se* in a foreclosure proceeding before State Supreme Court Justice Beatrice Shainswit. *See* my earlier opinion dated November 2, 1995.

11. Dr. Goldstein's report reads:

Ms. de Kleinman refused to be interviewed when I visited her at the Metropolitan Correctional Center ... on February 27, 1996, but she did spend some time providing me with the constitutional basis for her refusal. She claimed she had made a motion to "vacate and expunge" the Order for psychiatric evaluation and that your Order was "null and void."

March 24 of '95, and that order still continuing in effect, I put to you, do you have any intention of complying with my order and the underlying order of Judge Bernstein of March 9 of 1994?

MS. de KLEINMAN: I will not relinquish my rights to due process and equal protection under the law. The order is void ab initio. Your Honor has no jurisdiction, the bankruptcy court has no jurisdiction. . . .

\*   \*   \*   \*   \*   \*

THE COURT: Therefore, you have no intention of complying, is that what you are telling me?

MS. de KLEINMAN: I am not complying with a void order and you cannot hold me in contempt of an order void ab initio.

*United States v. Petito,* 671 F.2d 68, 72 (2d Cir.1981), *cert. denied,* 459 U.S. 824, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982), states as to the functions of civil and criminal contempt:

The one is coercive, to compel obedience to a lawful court order; the other is retributive, to punish for an offense to the public and to vindicate the power of the court.

\*   \*   \*   \*   \*   \*

An individual who refuses obedience to a valid order is subject to both civil and criminal contempt for the same acts.

\*   \*   \*   \*   \*   \*

The public interest in an orderly government demands respect for compliance with court mandates. Thus, to disregard a court order may at the same time subject an individual civil contemnor to criminal contempt proceedings for his violation of the law. A trial court ordinarily first applies the coercive remedy of civil contempt and then only makes use of the criminal sanction when the disobedience continues.

Again, as I noted earlier, until Mrs. de Kleinman's civil detention in March of 1995, she possessed two luxury apartments at the Olympic Towers on Fifth Avenue (residing in one) and one elsewhere, but had failed to make mortgage or maintenance payments to the cooperatives or the banks as to any of them since 1987. By 1995, the unpaid maintenance charges were between $300,000 and $400,000, and the arrears in mortgage payments were somewhere close to $2,000,000 and those arrears continue. The litigation expenses of the banks and the cooperatives trying to deal with this must have been and continues to be substantial.[12]

This has also been an extraordinarily expensive estate to administer. The Trustee's counsel fees to date, he advises me, have exceeded $300,000 and more than $12,000 of out-of-pocket disbursements have been incurred.

The bankruptcy laws are designed to give businesses and individuals in this country a fresh start [13] when they get in way over their heads in their financial dealings. They were not designed to provide a shelter to frustrate and put to unwarranted expense well-meaning creditors who had business dealings with a debtor who thereafter invokes bankruptcy.

De Kleinman invoked the protection of the bankruptcy court, yet it is obvious, even apart from Judge Abram's observations, *supra,* that from the minute she did, she willfully and deliberately abused the entire process, using it instead to protect herself and her million dollar apartments, and to avoid all payments in any amount whatever to all creditors.

However, having invoked the bankruptcy court's protection, she was, it goes without saying, under a duty to comply with its orders. She *can* comply. She has at least twice stated that fact. The order in question is perfectly reasonable. For well over two years, de Kleinman has refused to comply, notwithstanding a succession of orders and her incarceration for civil contempt for over one year. It is now painfully apparent that in this case, the means this Court has to induce or compel her to comply is ineffective.

---

12. Foreclosure and other proceedings are now under way in state courts.

13. Not a "head start" as Judge Bernstein noted earlier in commenting on de Kleinman's efforts. *In re de Kleinman,* 172 B.R. 764 at 770.

However, to vindicate the court's power and integrity and the public's interest in orderly government, in the face of long-standing willful and deliberate noncompliance, the court has the power to punish. Accordingly, I certify that de Kleinman's willful contempt for a year of this Court's order of March 24 of 1995,[14] was committed commencing then and continues to be committed now before me in my presence.

A court cannot permit a debtor in this situation to endeavor to wait the Court out, to further whatever plan or purpose of concealment she may have without incurring penalty.

Accordingly, pursuant to 18 U.S.C. § 401(3) providing that "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority ... as disobedience or resistance to its lawful ... order ..." I reaffirm my finding on March 24, 1995 that de Kleinman has refused and continues to

refuse to answer appropriate questions and make production of documents and schedules that are within her command. *United States v. Patterson*, 219 F.2d 659 (2d Cir.1995). Under the guidelines of *Rojas v. United States*, 55 F.3d 61 (2d Cir.1995), I find de Kleinman guilty of criminal contempt for her conduct before me starting on March 24, 1995 and continuing to this day, and on this finding she is sentenced to a term of imprisonment for a period of six months in the custody of the Attorney General, that term commencing March 28, 1996 as was ordered that date in open court.[15]

The foregoing constitutes my findings of fact and conclusions of law and is so ordered.

---

**14.** This is in addition to a year of disobedience before that, starting with Judge Bernstein's order of March 9, 1994.

**15.** One final matter that must be addressed is de Kleinman's comment at the very end of the March 28, 1996 session at which she was adjudged on criminal contempt where she stated:

I make a motion for my immediate release ... on the grounds that your Honor incarcerated me already for one year without a jury trial, without a prosecutor, without benefit of counsel to which I am absolutely entitled in the Second Circuit. ...

De Kleinman (whose father, I understand, was a successful lawyer in New Jersey) started this Bankruptcy Court Chapter 11 proceeding *pro se* and remained *pro se* through her numerous Bankruptcy Court appearances before Judges Abram and Bernstein, including the early critical sessions in 1994 where she was found in contempt and jailed for some two hours by the marshals. She was *pro se* on her some 26 appeals to this Court from the Bankruptcy Court, and almost as many appeals to the Court of Appeals, and in all her dealings with the United States Supreme Court, and in her dealings with Courts of the State of New York. I further note that when she filed an appeal for her corporation, Apartment Locating, Inc., de Kleinman specifically requested that Apartment Locating *not* be required to appear by counsel.

The first time I am aware she demanded counsel was late in the hearing before me a year ago on March 24, 1995 at which she was found in

civil contempt. And as observed earlier, *before* she came to that hearing, she knew that the purpose was to determine *de novo* whether she *was* in contempt and should be civilly incarcerated to compel compliance. She made no mention of counsel at the outset of that hearing and the subject was not raised until late in the session, when it appeared that her numerous grounds of opposition were not going to avail her. In those circumstances, I viewed her belated request for an adjournment to get a lawyer as a last-ditch delaying tactic, and denied the request. Curiously, at the very end of that same session as the marshals were leading her out, she twice said, "I am ready to comply with the order." Obviously she did not, and she was later quoted by a New York Post reporter (accurately, she acknowledges) that she was only "playing with the Judge". Even after this, she did not get counsel at any time. I urged her to get a lawyer at the session of February 16, 1996, but she did not do so.

Accordingly, her last-minute claim of being unfairly dealt with by being "without benefit of counsel to which I am absolutely entitled" through all this sorry business is without support as demonstrated by her charging forward *pro se*, starting in 1991, on perhaps over 100 occasions in every court from Bankruptcy to the Supreme Court of the United States, with full knowledge that she had a right to counsel if she chose.