38 F.3d 627
 POTAMKIN CADILLAC CORP., Potamkin Total Leasing Inc.,
Potamkin Toyota Corp., Metropolitan Auto Prep, Inc.,
Potamkin Ford, Inc., Potamkin AMC/Jeep/Renault, Inc.,
Potamkin Cadillac, Inc., Potamkin Chevrolet Corp., also
known as Vic Potamkin Chevrolet, Inc., Robert Potamkin
Cadillac, Inc., Potamkin Chrysler-Plymouth-Dodge, Inc., Vic
Potamkin Chevrolet, Inc., Potamkin Dodge, Inc., Potamkin
Hyundai, Inc., Potamkin Lincoln Mercury, Inc., Potamkin of
Broward Subaru, Inc., and Cutler Ridge Lincoln Mercury,
Inc., Plaintiffs-Appellees,
v.
B.R.I. COVERAGE CORP., Donald P. Ferrarini, Harold K. Ross,
and H.K. Ross Corp., Defendants-Appellants.
 No. 1921, Docket 94-7157.
 United States Court of Appeals,
Second Circuit.
 Argued June 27, 1994.
Decided Oct. 5, 1994.
 
 James B. Zane, New York City (Edward S. Rudofsky, Zane & Rudofsky, on the brief), for plaintiffs-appellees.
 Gregory Getz, New York City (Jerome M. Leitner, Leitner & Getz, on the brief), for defendants-appellants B.R.I. Coverage Corp. and Donald P. Ferrarini.
 Gold & Wachtel, New York City (Elliot Silverman, of counsel), on the brief, for defendants-appellants Harold K. Ross and H.K. Ross Corp.
 Before: MESKILL, KEARSE, and ALTIMARI, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants B.R.I. Coverage Corp. et al. (collectively "BRI"), licensed commercial insurance brokers, appeal from so much of a judgment of the United States District Court for the Southern District of New York, Thomas P. Griesa, Chief Judge, as dismissed BRI's counterclaims against plaintiffs Potamkin Cadillac Corp. et al. (collectively "Potamkin") for $776,368 in insurance premiums allegedly advanced by BRI to insurers on behalf of Potamkin. The district court adopted the recommendation of a special master that BRI's counterclaims be denied because BRI failed to prove that it had advanced those premiums. On appeal, BRI contends principally that the district court erred in excluding a document on which it relied to prove its claims and that, in any event, Potamkin had admitted that BRI advanced the premiums in question. Potamkin disputes these contentions and moves for appellate sanctions pursuant to Fed.R.App.P. 38.
 
 
 2
 We reject BRI's contentions and affirm the judgment of the district court. We deny Potamkin's motion for sanctions.
 
 I. BACKGROUND
 
 3
 Potamkin, a group of corporate entities engaged in the sale, lease, and servicing of automobiles, retained BRI as its insurance broker in 1980. In 1987, the relationship soured, and Potamkin commenced the present action, charging BRI with violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1961 et seq. (1988) ("RICO"), fraud, unjust enrichment, and insurance malpractice. Potamkin alleged that defendants had defrauded it through a scheme that included charging for insurance coverage that was not provided; charging "service fees" supposedly in lieu of commissions, while concealing percentage commissions in the premium charges it billed to Potamkin; and overstating premiums and converting payments made by Potamkin. BRI denied Potamkin's allegations and counterclaimed to recover amounts allegedly owed by Potamkin, including amounts for premiums allegedly advanced by BRI to insurance companies, for which Potamkin had never reimbursed BRI ("unreimbursed premium advances").
 
 
 4
 In November 1991, after four years of protracted and acrimonious discovery, the action came to trial. After a jury had been empaneled and opening statements had been made, the parties entered into settlement negotiations. The trial was terminated when the parties entered into a stipulation withdrawing from consideration, inter alia, Potamkin's RICO and fraud claims and leaving for adjudication only (a) an accounting with respect to Potamkin's claims for return of premiums, unapplied payments, overbillings, and overpayments, and (b) BRI's counterclaims for, inter alia, unreimbursed premium advances. As discussed in Part I.A. below, both Potamkin and BRI submitted to the court evidence and summaries in support of their claims.
 
 
 5
 After receiving written submissions and hearing oral argument, the district court suggested that the parties submit the accounting disputes to a special master who would make a recommendation to the court as to the resolution of outstanding issues. The parties agreed.
 
 
 6
 A. The Proceedings Before the Special Master
 
 
 7
 In June 1992, the district court appointed Laurence A. Silverman, Esq., as special master to render a "recommendation based upon the evidence already submitted to the Court." (Order dated June 15, 1992.) The special master proceeded to conduct hearings to review the legal issues and the evidence previously submitted.
 
 
 8
 In support of its counterclaims, BRI relied primarily on an accounting history prepared by the computer department of B.R.I. Coverage Corp. (the "company"), allegedly detailing all unreimbursed advanced premiums (the "Potamkin History" or the "History"). The affidavit of Edward DeLuca, the company's controller and the head of its accounting department, described the History's contents and compilation. DeLuca stated that the History "represent[ed] all business transacted between [the company] and the Potamkin organization over the course of the entirety of the[ir] relationship," and had been prepared "several years ago" by the company's computer department "by extracting information concerning the transactions from [the company's] computer history tapes." (Affidavit of Edward DeLuca, dated December 3, 1991 ("DeLuca Affidavit"), pp 7, 2.) DeLuca stated that this process required the computer department to program its computer system "to scan the history tapes, extract the pertinent information concerning the transactions between the parties," and create a printout. (Id. p 2.) His affidavit was silent as to why the History had been prepared, what documents were the sources for the computer tapes from which the History had been prepared, and why, despite Potamkin's requests covering such documents, the tapes themselves had not been produced during the four years of discovery.
 
 
 9
 The DeLuca Affidavit stated that though DeLuca had found no "material financial improprieties" in the History (id. p 9), a "test sample review" comparing parts of the History to the company's open ledger records had revealed a number of "keypunch errors, misapplication of cash or billings among policies, and policies mislabeled as unassigned. By virtue of the method of coding of certain entries by [company] billing clerks, more than one entry within the Potamkin History File must be consulted in order to track the payment history of a particular policy." (Id. p 8.) He also stated that the totals shown in the History incorrectly included "several transactions representing $6,212,003 and $285,685 in gross premiums" for 1986-87, as to which "Potamkin elected to by-pass BRI and pay the Home [Insurance Company] directly" (id. p 11), and for which "adjustment has to be made to the balances to accurately reflect the monies owed by Potamkin to BRI" (id. p 12).
 
 
 10
 BRI also produced a document called the "Potamkin Cash Receipts Register," generated by computer in July 1988, detailing certain transactions between the company and Potamkin, and produced copies of canceled company checks as evidence of its payment of some of Potamkin's premiums. For many of the claimed advances BRI produced no canceled checks, and many entries on the History showed BRI's payment on behalf of Potamkin as having been made by "check no. 0000."
 
 
 11
 Potamkin, in support of its own claims and in support of its defenses to BRI's counterclaims, relied primarily on some of the evidence proffered by BRI. For example, Potamkin argued that portions of the History constituted admissions by BRI of Potamkin's payment of certain premiums.
 
 
 12
 Both sides also produced expert opinion evidence. BRI submitted affidavits of an independent accountant opining that the History was largely correct. Potamkin submitted reports of two academics opining that the History was self-serving and that BRI had not established the document's reliability.
 
 
 13
 After reviewing the presentations, the special master made tentative findings and circulated a draft report to the parties. Seeing that the special master intended to recommend denial of all of BRI's counterclaims for unreimbursed premium advances, BRI, with the master's permission, moved for reconsideration of the draft, arguing for the first time (a) that the History was presumptively reliable as a business record admissible under Fed.R.Evid. 803(6), and (b) that Potamkin had admitted in its complaint that BRI had made the pertinent premium advances on Potamkin's behalf.
 
 
 14
 B. The Recommendations of the Special Master
 
 
 15
 In June 1993, the special master submitted to the district court his final report recommending the granting of certain of Potamkin's claims and the denial of all of BRI's counterclaims. (Recommendation of the Special Master ("Recommendation").) As to the counterclaims for unreimbursed premium advances, the master rejected BRI's contention that Potamkin had admitted those claims (Recommendation at 46-47), and concluded that the evidence produced by BRI was "insufficient to prove that it advanced moneys on behalf of Potamkin" (id. at 45).
 
 
 16
 The special master considered BRI's Potamkin History insufficiently verifiable, stating that
 
 
 17
 BRI does not provide any primary evidence (such as copies of checks, or remittance advices for example) that it advanced the money it now seeks to recover from Potamkin. Despite repeated requests by the Special Master, BRI has been unable to trace the alleged unreimbursed advances to any specific credits it purportedly gave to Potamkin on particular policies or to any checks. Neither Edward DeLuca nor [BRI's independent accountant] in their affidavits submitted on behalf of BRI explain[s] the absence of checks. In support of its other claims BRI has offered copies of checks as evidence of payment.
 
 
 18
 (Id. at 44-45.)
 
 
 19
 The special master found troubling the fact that none of BRI's affidavits revealed any effort to "check whether amounts listed as unpaid advances owed to BRI were in fact paid by BRI" or to "explain the recurring reference to checks numbered '0000' " as representing payment. (Id. at 48.) He found that BRI's "affidavits are primarily directed to whether the proper amounts were billed by BRI to Potamkin and whether there are any outstanding claims by any insurance company--not to whether payments were made by BRI." (Id.) He concluded that,
 
 
 20
 despite our repeated requests that BRI trace the history of the specific allegedly unreimbursed advances to show it made the payments in some form, no evidence of payment has been presented. As shown below, BRI's sole evidence of payment in most cases is cryptic references to check "0000" in the Potamkin History and citations to audit statements. Too often when we were able to put together the history of the claimed amounts, we found that the amount being claimed was demonstrably wrong.... There simply is no credible, admissible evidence that BRI paid the amounts it is seeking from Potamkin as unreimbursed advances.
 
 
 21
 (Id. at 49-50.)
 
 
 22
 The master rejected BRI's contention that the History was admissible, and should be deemed reliable, as a business record. He found that "[f]ar from being a contemporaneous business record, the Potamkin History was prepared at the request of counsel." (Id. at 47.) He noted that in a November 1989 deposition, BRI had taken the position that the History was privileged as attorney work product. (Id.) He found that none of the affidavits submitted by BRI established that the History was a business record. Although the DeLuca Affidavit described the History as having been prepared from BRI's historical computer tapes, the master found that there was "no evidence presented of what information was the source of these computer tapes and indeed, the tapes themselves have apparently never been produced, despite their request by Potamkin." (Id. at 48.)
 
 
 23
 In sum, though the special master found that, where pertinent, the History could be relied on by Potamkin as admissions of BRI to support claims asserted by Potamkin (id. at 16), and though he gave some weight to the History in considering BRI's defenses against claims by Potamkin (id. at 45), he concluded that "the Potamkin History, by itself, is not sufficient to support BRI's claims against Potamkin ... particularly ... in the absence of any explanation for the failure to submit checks" (id. at 45-46). BRI had failed to meet its "burden of presenting competent evidence that it paid the money it seeks reimbursement for." (Id.)
 
 
 24
 The special master noted that his mandate from the district court was to make recommendations based on the evidence previously submitted to the court and that BRI, in support of its motion for reconsideration, had submitted to him audit statements and other documents that had not previously been furnished. The master stated that the newly submitted materials did not form the basis for his recommendations but that he had reviewed them and they did not alter the views expressed in the Recommendation. (Id. at 16.)
 
 C. The Findings of the District Court
 
 25
 BRI objected in the district court to the recommendations of the special master, arguing principally that direct proof of payment in the form of checks was not necessary since BRI and the insurers often simply offset amounts owed with credits, and that the Potamkin History should have been accepted as a business record that "itself constitutes direct prima facie evidence of BRI's claims--the veracity of which having been duly established, and having gone uncontroverted, renders defendants['] claims undeniable." (Brief for Defendants in Support of Objections to the Recommendation, at 14.)
 
 
 26
 The district court concluded that "all of the objections of defendants are unfounded, and that the Recommendation of the Special Master should be accepted in its entirety" for the reasons stated in the Recommendation, and that "[n]o useful purpose would be served by repeating what has been set forth so well by the Special Master." (Opinion dated December 14, 1993, at 2-3.)
 
 
 27
 Judgment was entered in favor of Potamkin in accordance with the recommendations of the master. This appeal followed.
 
 II. DISCUSSION
 
 28
 On appeal, BRI principally pursues the contentions that its Potamkin History should have been admitted as a business record and that Potamkin admitted that BRI had paid the premiums for which BRI here seeks reimbursement. We find no merit in its contentions.
 
 A. The BRI History
 
 29
 The party proffering evidence has the burden of showing that the prerequisites for its admissibility are met. The district court's findings as to whether those prerequisites have been met may not be overturned unless they are clearly erroneous. See, e.g., Gentile v. County of Suffolk, 926 F.2d 142, 151 (2d Cir.1991); United States v. Maldonado-Rivera, 922 F.2d 934, 957 (2d Cir.1990), cert. denied, 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991). "The findings of a [special] master, to the extent that the court adopts them, shall be considered as the findings of the court," Fed.R.Civ.P. 52(a), and cannot be set aside unless they are clearly erroneous, Mentor Insurance Co. v. Brannkasse, 996 F.2d 506, 513 (2d Cir.1993). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 30
 Rule 803(6) of the Federal Rules of Evidence excepts from the operation of the hearsay rule, see Fed.R.Evid. 802, any
 
 
 31
 memorandum, report, record or data compilation, in any form, of acts [or] events ... made at or near the time by, or from knowledge transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of the business activity to make the memorandum, report, record or data compilation, ... unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.
 
 
 32
 Fed.R.Evid. 803(6) (emphasis added). A business record may include data stored electronically on computers and later printed out for presentation in court, so long as the "original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." United States v. Hernandez, 913 F.2d 1506, 1512-13 (10th Cir.1990), cert. denied, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991); see also Notes of Advisory Committee on 1972 Proposed Rules of Evidence. Data prepared or compiled for use in litigation are not admissible as business records. See, e.g., Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 480-81, 87 L.Ed. 645 (1943). Thus, a document that constitutes attorney work product, i.e., material prepared by or at the instance of an attorney during or in anticipation of litigation and reflecting the attorney's thought processes, see, e.g., Hickman v. Taylor, 329 U.S. 495, 510-11, 67 S.Ct. 385, 393-94, 91 L.Ed. 451 (1947), is not a business record within the meaning of Rule 803(6).
 
 
 33
 In all cases, "the principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." Saks International, Inc. v. M/V "Export Champion", 817 F.2d 1011, 1013 (2d Cir.1987). The determination of whether, in all the circumstances, the records are sufficiently reliable to warrant their admission in evidence is left to the sound discretion of the trial court. See, e.g., id.; United States v. Lavin, 480 F.2d 657, 662 (2d Cir.1973).
 
 
 34
 We see no error in the findings of the special master, which were adopted by the district court, that BRI did not show that its Potamkin History met the prerequisites for admissibility as a business record within the meaning of Rule 803. In concluding that BRI had not met its burden of showing that the History was prepared from original computer data compiled in accordance with regular business practice, the court was entitled to take into account BRI's refusal, despite discovery requests, to produce the computer tapes from which DeLuca asserted the History had been compiled. Further, the DeLuca Affidavit disclosed that the testing of the History showed that it contained inaccuracies resulting from, e.g., keypunch errors, misapplication of cash or billings among policies, mislabeling of policies, and miscodings. Whether or not these errors were corrected, the fact that they were made suggests that the History required significant selection and interpretation of data, not simply a downloading of information previously computerized in the regular course of business. The view that the document was not prepared in the ordinary course of business was further supported by BRI's prior statements, recorded in a deposition transcript, that the History in fact constituted its attorney's work product.
 
 
 35
 Nor do we see any abuse of discretion in the conclusion that the History was not sufficiently reliable to permit BRI to use it in support of its claims that it made unreimbursed advances on behalf of Potamkin. As noted above, BRI had refused to produce the computer tapes from which it claimed the History had been culled, and hence the special master could not determine whether those tapes themselves would qualify as business records. Further, DeLuca himself admitted that the History contained numerous uncorrected errors. The special master noted that there was "no indication that any effort was made to check whether the amounts listed as unpaid advances owed to BRI were in fact paid by BRI" (Recommendation at 48), and observed that "[t]oo often when we were able to put toge[t]her the history of the claimed amounts, we found that the amount being claimed was demonstrably wrong" (id. at 49). BRI has not persuaded us of any error in the special master's findings.
 
 
 36
 BRI contends that in many instances its premium advance to an insurer took the form of a bookkeeping offset of that amount against an amount owed by the insurer, and thus the district court abused its discretion in finding the History unreliable simply because BRI failed to produce evidence of payment in the form of cancelled checks. Though the absence of such checks, together with the recurrence of supposed payments by checks numbered "0000," was plainly pertinent to the decision, we reject BRI's suggestion that the absence of canceled checks was the sole basis for the decision. The special master noted that he had made "repeated requests that BRI trace the history of the specific allegedly unreimbursed advances to show it had made the payments in some form " (id. (emphasis added)), or that it show "any specific credits it purportedly gave to Potamkin on particular policies" (id. at 45 (emphasis added)). The master noted that BRI presented no evidence "such as copies of checks, or remittance advices for example " (id. (emphasis added)), to show that it had made the alleged unreimbursed payments. While business might have been conducted without any checks changing hands, the special master was entitled to find it not credible, given the large sums involved, that no communication or other documents would pass between the parties if the advances were in fact made.
 
 
 37
 Finally, we note that BRI contends that the special master could not reject the History as proof of BRI's payments on Potamkin's behalf because he relied on that document in granting certain claims of Potamkin. This argument is unsound. Assertions by a party in documents it has prepared and offers into evidence are admissible against it as admissions, see Fed.R.Evid. 801(d)(2)(A), and hence are evidence on the basis of which the court may make findings of fact. See, e.g., United States v. Bedford Associates, 713 F.2d 895, 905 (2d Cir.1983) (statements in answers to interrogatories or in proposed findings of fact are admissions admissible against the party that made them); Bertha Building Corp. v. National Theatres Corp., 248 F.2d 833, 836 (1957). Such statements are nonhearsay admissions, however, only when offered against, not by, the party that made them.
 
 B. The Alleged Potamkin Admission
 
 38
 BRI also pursues its contention that Potamkin admitted that BRI had made the advance payments at issue in BRI's counterclaims when Potamkin alleged in its complaint that
 
 
 39
 ... [a]s recently as June, 1987, BRI sent invoices to Potamkin through the mails for premiums allegedly due on policies BRI purportedly placed with Home, claiming that Potamkin still owes Home sums due as premiums. Such invoices were false and fraudulent, however, in that Potamkin has previously made all payments due to Home and Home has confirmed to Potamkin that Potamkin has made all premium payments required by Home and does not owe any premiums to Home.
 
 
 40
 (Complaint p 72.) The special master plainly did not err in ruling that the allegations that "Potamkin" had "made all premium payments" was not a concession that those payments had been made by BRI.
 
 C. Other Arguments
 
 41
 BRI's other arguments include the contention that even without consideration of the History, "review of the Record in its entirety ... leads to the ineluctable conclusion that BRI made the premium advances on behalf of Potamkin...." This is no more than an argument that the weight of the evidence favored BRI. The weight of the evidence is a matter for argument to the trier of fact, not a basis for reversal on appeal. See, e.g., Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 54 (2d Cir.1993) (per curiam); Jim Beam Brands Co. v. Beamish & Crawford Ltd., 937 F.2d 729, 736 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1169, 117 L.Ed.2d 415 (1992); Healey v. Chelsea Resources, Ltd., 947 F.2d 611, 618 (2d Cir.1991) (mere presence of evidence to support an inference contrary to that drawn by the trier of fact does not mean that the findings were clearly erroneous). The district court was unpersuaded that BRI proved that it made the claimed advances, and we see no error in the court's allocation of the burden of proof and no clear error in its findings of fact.
 
 D. Potamkin's Motion for Sanctions
 
 42
 We decline to award sanctions against BRI for pursuing this appeal. Though we reject all of its arguments on appeal, some of them are not frivolous, and we do not conclude that BRI exhibited "vexatious tactics or manifest bad faith." Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir.1990), cert. denied, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991).
 
 CONCLUSION
 
 43
 We have considered all of BRI's contentions on appeal and have found them to be without merit. The judgment of the district court is affirmed.