### ELSEVIER B.V., Elsevier Inc., and Mosby, Inc., Plaintiffs,

v.

### UNITEDHEALTH GROUP, INC., ACN Group, Inc., Optimum Choice, Inc., Ovations, Inc., Uniprise, Inc., United Behavioral Health, Inc., Ingenix, Inc., and ABC Company Nos. 1–10, Defendants.

No. 09 Civ. 2124(WHP).

United States District Court, S.D. New York.

March 7, 2011.

---

William Dunnegan, Esq., Laura Jean Scileppi, Esq., Dunnegan LLC, New York, NY, for Plaintiffs.

Sri Krishna Sankaran, Esq., Dorsey & Whitney, LLP, Minneapolis, MN, for Defendants.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiff Elsevier Inc. and two related entities (collectively, "Elsevier") bring this action alleging breach of contract and contributory copyright infringement against Ingenix, Inc. ("Ingenix"), and copyright infringement and unauthorized computer access against Ingenix's parent company UnitedHealth Group, Inc. and 93 subsidiaries (collectively, "UHG"). The identities of the UHG employees who allegedly accessed Elsevier's database are relevant to this action, but ascertaining them involves burdensome discovery. In an effort to obviate that discovery, Plaintiffs move for partial summary judgment on two test cases of copyright infringement. Elsevier contends that it can show that two of its copyrighted articles were accessed and copied by employees of two separate unauthorized, yet unidentified, UHG subsidiaries. In addition, Defendants move for partial summary judgment and contend that Elsevier cannot establish infringement of either article. For the following reasons, the parties' motions for partial summary judgment are denied.

## BACKGROUND

Elsevier's business is providing on-line access to scientific materials to subscribers for a fee. (Declaration of Sonja Lendi dated June 29, 2010 ("Lendi Decl.") ¶ 2.) Those materials include more than 6,000 books and 2,500 journals. (Lendi Decl. ¶ 2.)

On December 19, 2005, Elsevier and Ingenix entered into a license agreement. (Declaration of William Dunnegan dated June 29, 2010 ("Dunnegan Decl.") Ex. P: Subscription Agreement dated Dec. 19, 2005 (the "Agreement").) The Agreement granted 50 Ingenix employees and independent contractors affiliated with Ingenix's Basking Ridge, NJ site ("Authorized Users"), access to Elsevier's on-line database ScienceDirect for the 2006 calendar year. (Agreement § 1.2, Schedule 2.) Under the Agreement, Elsevier granted access by recognizing an Internet Protocol ("IP") address provided by Ingenix (the "Ingenix IP Address"), from which Authorized Users would access the internet and ScienceDirect. (Agreement § 1.2, Schedule 2.) The Agreement also required that Ingenix "use reasonable efforts" to prevent unauthorized use. (Agreement § 3.2.)

On October 31, 2006, the parties entered into a renewal of the Agreement for the 2007 calendar year. (Dunnegan Decl. Ex R: First Amendment to Elsevier License Agreement dated Oct. 31, 2006 ("Renewal").) While Ingenix was negotiating the Renewal, several Ingenix managers were aware that employees of the entire UHG organization—not just the Authorized Users—could access the ScienceDirect database through the Ingenix IP Addresses. (Dunnegan Decl. Ex. Q: Email from Elizabeth Arnold to Brian Bennet and Alexander Kordonsky dated Nov. 8, 2006.) Nevertheless, the Renewal did not modify Ingenix's mode of access to Elsevier's database. (Renewal at 1.) Thus, during 2006 and 2007, employees from all of UHG's subsidiaries, not just

Ingenix, could access the ScienceDirect database.

Plaintiffs allege that, between 2006 and 2007, UHG employees not covered by the Agreement and Renewal infringed Elsevier's copyrights in over one-thousand copyrighted articles by downloading them without a license. Elsevier logged instances of access to its database in the normal course of business and has compiled a "Master Spreadsheet" showing access to articles in the ScienceDirect database from the Ingenix IP Address. (Lendi Decl. ¶¶ 6–7.)

Elsevier seeks partial summary judgment that Defendants infringed copyrights in two articles: "Arterial Steal Syndrome after Orthotopic Liver Transplantation" ("Arterial Steal") and "Long–Term Outcome of Renal Transplantation from Marginal Donors" ("Renal Transplantation," together, the "Articles"). Both Articles were published in the journal *Transplantation Proceedings,* Volume 38, Number 10 (the "Journal"). (Statement of Plaintiff Elsevier Inc. Pursuant to Rule 56.1, dated June 29, 2010 ("Pl.'s 56.1 Stmt.") ¶ 3; Declaration of Andrew Berin dated June 29, 2010 ("Berin Decl.") Ex. D: Excerpts from the Journal.) Elsevier received a United States Certificate of Copyright Registration for the Journal, but not for the individual Articles. (Pl.'s 56.1 Stmt. ¶ 5; Declaration of Jacqueline Garrett dated June 29, 2010 ("Garrett Decl.") Ex I: U.S. Certificate of Copyright Registration No. TX 6–554–616 for the Journal ("Journal Registration").)

Elsevier asserts that individuals using the Ingenix IP Address accessed Arterial Steal on April 20, 2007, and Renal Transplantation on June 25, 2007. (Pl.'s 56.1 Stmt. ¶¶ 6, 8.) Elsevier contends that United Healthcare Services, Inc. ("UHCS") is the "common contracting entity" that employs all domestic UHG employees regardless of the subsidiary to which they are assigned. (Pl.'s 56.1 Stmt. ¶¶ 7, 9; Dunne-

gan Decl. Ex. J: Declaration of Matthew E. Klein dated Dec. 30, 2009 ("Klein Decl.") ¶ 11.) Elsevier further asserts that the individuals who accessed the Articles were employees of UHCS, "except in the improbable event that [they were] in a foreign country." (Pl.'s 56.1 Stmt. ¶¶ 7, 9.) Moreover, Elsevier contends that UHG has "so many subsidiaries that no reasonable person could conclude that the employee of UHCS who accessed the 'Arterial Steal' copyright ... was employed by the same subsidiary as ... the employee of UHCS who accessed the 'Renal Transplantation' article." (Pl.'s 56.1 Stmt. ¶ 11.) In other words, because only Ingenix was licensed and because it is unlikely that the two individuals who accessed the Articles worked for the same subsidiary, at least one of the employees worked for an unlicensed subsidiary.

## DISCUSSION

### I.  *Legal Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige,* 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has made the initial showing that there is no genuine dispute of material fact, the nonmoving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original); *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.2003) (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348). The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir.2005).

## II. *Copyright Infringement*

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir.2003) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). Additionally, a plaintiff must demonstrate compliance with § 411 of the Copyright Act, which requires preregistration or registration for U.S. copyrights as a prerequisite for bringing a copyright infringement action. 17 U.S.C. § 411(a); *Reed Elsevier Inc. v. Muchnick*, —— U.S. ——, 130 S.Ct. 1237, 1241–42, 176 L.Ed.2d 18 (2010).

### A. *Ownership of a Valid Copyright*

Elsevier asserts ownership of the copyrights in the Articles based on copyright transfers executed by the authors of the Articles (the "Transfer Agreements"). (Berin Deck Ex. A: Signature Page from Copyright Transfer Agreement dated Nov. 7, 2006 between Elsevier Inc. and the authors of Renal Transplantation ("Renal Transplantation Transfer Agreement"); Berin Decl. Ex B: Signature Page from Copyright Transfer Agreement dated Oct. 20, 2006 between Elsevier Inc. and the authors of Arterial Steel ("Arterial Steel Transfer Agreement").) Elsevier produced only the signature pages of the Transfer Agreements, which instruct the authors to "review our policies and the Publishing Agreement, and indicate your acceptance of the terms." (Renal Transplantation Transfer Agreement at 1; Arterial Steel Transfer Agreement at 1.)

Andrew Berin, Publishing Director for the Journal, explained that only the signature pages of the executed Transfer Agreements are offered because either the authors did not return the second and third pages, or Elsevier did not retain them. (Berin Decl. ¶¶ 1–2, 5.) Berin further stated that the signature pages were produced from Elsevier's files and conform to the "same format as other Elsevier copyright transfer agreements ... [used] in the ordinary course of business." (Reply Declaration of Andrew Berin dated Aug. 24, 2010 ("Berin Reply Decl.") ¶ 3.) Additionally, the signature pages bear unique reference numbers which match Elsevier's records for the Articles. (Berin Reply Decl. ¶ 3.) Separately, Elsevier submitted the second and third pages of its form transfer agreements, including the "Publishing Agreement" referenced on the signature pages. (Berin Decl. Ex. C: Form Second and Third Pages of Elsevier Copyright Transfer Agreements ("Publishing Agreement").) Berin stated that these pages were "used at the time of the [Transfer Agreements]." (Berin Decl. ¶ 5.)

Despite Berin's testimony, Defendants contend that the Transfer Agreements are inadmissible because they have not been authenticated and thus Elsevier has not met its burden of showing ownership of the copyrights in the Articles. Under Federal Rule of Evidence 901, "[t]he requirement of authentication or identifica-

tion as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a). "Rule 901 'does not erect a particularly high hurdle,' and that hurdle may be cleared by 'circumstantial evidence.'" *U.S. v. Tin Yat Chin,* 371 F.3d 31, 37 (2d Cir.2004) (quoting *United States v. Dhinsa,* 243 F.3d 635, 658–59 (2d Cir. 2001)). Sufficient circumstantial evidence "may include distinctive characteristics of the document itself, such as its '[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.'" *U.S. v. Maldonado–Rivera,* 922 F.2d 934, 957 (2d Cir.1990) (quoting Fed.R.Evid. 901(b)(4)).

■ Defendants' lack of authentication argument is without merit. Berin attested to the following: (1) the Transfer Agreements were found in Elsevier's files, (2) each conformed to Elsevier's standard transfer agreement template, and (3) each bore the unique reference numbers associated with the Articles. That is more than sufficient to authenticate the Transfer Agreements and the Publication Agreement and therefore Elsevier has established ownership of the copyrights in the Articles.

### B. *Unauthorized Copying*

■ "To satisfy the second element of an infringement claim—the 'unauthorized copying' element—a plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" *Jorgensen,* 351 F.3d at 51.

### 1. *Actual Copying*

As proof of copying, Elsevier relies on a "Master Spreadsheet" compiled by Sonja Lendi ("Lendi"), Elsevier's "Usage Research Manager," that purportedly shows each instance someone using the Ingenix IP Address [1] accessed a full-text article on the ScienceDirect database. (Lendi Decl. ¶¶ 4, 5.) For Elsevier's motion, Lendi isolated two rows from the Master Spreadsheet and testified that they indicate that a user accessing the ScienceDirect database from the Ingenix IP Address downloaded the Articles. (Lendi Decl. Ex. G: Row 15730 of Master Spreadsheet; Lendi Decl. Ex. H: Row 18196 of Master Spreadsheet.)

■ Defendants argue that the Master Spreadsheet is inadmissible because Elsevier failed to authenticate it as a business record. "In all cases, the principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable." *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.,* 38 F.3d 627, 632–33 (2d Cir.1994) (internal quotations and citations omitted). The determination is left to the sound discretion of the trial court. *Potamkin,* 38 F.3d at 633.

■ Contrary to Defendants' assertions, the Master Spreadsheet has sufficient indicia of trustworthiness to be considered reliable. Lendi testified that the usage data compiled in the Master Spreadsheet is collected by dedicated third parties and is processed to remove errors. (Declaration of Sri K. Sankaran dated August 13, 2010 ("Sankaran Deck") Ex. 2: Excerpts from Deposition Sonja Lendi dated July 13, 2010 ("Lendi Dep.") at 35–40.) More-

---

1. The Master Spreadsheet includes instances of access from IP addresses other than the Ingenix IP Address but those instances are not relevant to these motions. (Lendi Decl. ¶ 4.)

over, the data is created, stored, and regularly relied on in Elsevier's normal course of business. (Lendi Decl. ¶ 6.) While pre-processed data accumulated by third parties is not retained by Elsevier, and Lendi only has a "high level" understanding of how that raw data is filtered, (Lendi Dep. at 37, 45), nothing suggests it contains inaccuracies or is otherwise untrustworthy. *Cf. Potamkin*, 38 F.3d at 633 (excluding record with clear errors on its face and no underlying data). Because Lendi authenticated the Master Spreadsheet, it is admissible as a business record.

■ Separately, Defendants argue that the Master Spreadsheet does not demonstrate actual copying of the full-text articles because it does not indicate whether downloads were full-texts or free abstracts. The record on this point is underdeveloped. Lendi testified that the Master Spreadsheet was filtered to include only downloads of PDF or HTML formatted files because those formats are used for full-text articles while a different format—excluded from the Master Spreadsheet—is used for abstracts. (Reply Declaration of Sonja Lendi dated Aug. 26, 2010 ("Lendi Reply Decl.") ¶ 3.) However, the field indicating whether a download was in PDF or HTML format was not included in the Master Spreadsheet. (Lendi Decl. Ex. G: Row 15730 of Master Spreadsheet; Lendi Decl. Ex. H: Row 18196 of Master Spreadsheet; Lendi Reply Decl. ¶ 3.) Further, Defendants show that corresponding rows on a separate spreadsheet that Lendi used to create the Master Spreadsheet (Lendi Dep. at 181), have format codes other than PDF or HTML—tending to show the rows do not represent downloads of full-text articles. (Sankaran Decl. Exs. 7, 11: Slaton Deposition Exs. 85, 89.) Although Defendants' evidence suggests the downloads were not full-text, it is impossible for the Court to discern whether the rows in Defendants' exhibits represent the same instances of

access as the rows in Plaintiffs' exhibits. Thus, genuine issues of fact—whether the two isolated rows from the Master Spreadsheet represent full-text downloads of the Articles and whether actual copying of Plaintiffs' copyrighted work occurred—exist.

### 2. *Improper or Unlawful Appropriation*

The central question in this litigation is whether the persons within the UHG organization who accessed ScienceDirect were Authorized Users. Elsevier contends those individuals were not authorized because all domestic employees of UHG were actually employed by UHCS, an entity not licensed to access ScienceDirect. (Pl.'s 56.1 Stmt. ¶¶ 7, 9; Dunnegan Decl. Ex. J: Klein Decl. ¶ 11.) From that contention, Elsevier asserts that since UHG's domestic employees outnumber its foreign employees, it is more likely than not that any access of ScienceDirect through the Ingenix IP Address, including the Articles at issue here, occurred as a result of activities by unauthorized, domestic UHCS employees. But that is not sufficient for summary judgment.

■ Elsevier has not met its burden of proving the specific acts of copyright infringement. *Jorgensen*, 351 F.3d at 51; *see also Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36, n. 3 (S.D.N.Y.1992) (citing cases dismissing "[b]road, sweeping allegations of infringement" with no specific allegations). Elsevier asks the Court to look at the distribution of domestic and foreign subsidiaries in Defendants' entire enterprise and make a judgment about the probability that two individual acts of computer access took place in the United States. Even if true, as Elsevier asserts, that only 26 of UHG's 225 subsidiaries are based outside the United States, (Transcript of Oral Argument dated Oct. 8, 2010 at 11–12), Elsevier offers no evidence or

reason to suggest that the blunt ratio of domestic to foreign subsidiaries in Defendants' enterprise should be applied to the specific downloads at issue on this motion. At best, the Master Spreadsheet entries show that each download was made from a different computer with a different "cookie." (Lendi Reply Decl. ¶ 6.) But at this point in the case, Elsevier is unable to offer evidence of the identities or locations of the individuals who downloaded the Articles.

Further, Elsevier's theory on this motion is at odds with the terms of the Agreement, which specifically authorized Ingenix employees or independent contractors located in Basking Ridge, NJ to access the ScienceDirect database. (Agreement § 1.2, Schedule 2.) While domestic UHG "employees" may contract with UHCS, that does not foreclose the possibility they also work for Ingenix. This is buttressed by Klein's sworn statement that "employees in the enterprise are employed by [UHCS], and assigned to work for various companies in the enterprise." (Dunnegan Decl. Ex. J: Klein Decl. ¶ 11.) Thus, a material issue of fact exists whether the individuals who downloaded the Articles were working for Ingenix and were one of the 50 Authorized Users at the time they accessed the Science Direct database.

■ On the other hand, Defendants contend they were authorized to access the ScienceDirect database under the Agreement and that Elsevier has the burden to prove that the individuals who downloaded the Articles were not authorized. While the copyright owner bears the burden of proving that a defendant's license does not apply in cases where "only the scope of the license is at issue," *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir.1995), the question here is whether the infringer had any license at all. Thus, the general rule—that defendant bears the burden of proving possession of a license—applies.

*See Bourne*, 68 F.3d at 631 (citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01.) A defendant may not "merely assert the existence of a license without evidence supporting defendant's position that the license covers the use in question; without such evidence, defendant cannot be said to have met its burden …". William F. Patry, *Patry on Copyright ("Patry")* § 5:133. It is undisputed that the Agreement was in effect at the time the Articles were downloaded. But Defendants have not offered any evidence that the individuals who downloaded the Articles worked for Ingenix and were covered by its license or that the Articles were downloaded through any other authorized means.

■ Nor is it unfair in these circumstances to place the burden of discovering the identities of the individuals who downloaded the Articles on Defendants. Not only are Defendants in the best position to know such information, Ingenix was obligated to use "reasonable efforts" to prevent unauthorized use (Agreement § 3.2), which should include keeping track of the identities of those individuals who access ScienceDirect from the Ingenix IP Address.

### C. Registration

Finally, Defendants argue that Elsevier has not satisfied the registration requirement of Section 411 of the Copyright Act. 17 U.S.C. § 411. Section 411 of the Copyright Act provides, subject to certain exceptions not applicable here, that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411. In some circumstances, the Section 411 registration requirement for an article included in a serial publication can be satis-

fied by the registration of that collective work. *Morris v. Business Concepts, Inc.*, 283 F.3d 502, 505 (2d Cir.2002).

Elsevier did not register the Articles individually, but instead registered the issue of the Journal in which the Articles were published. (Pl.'s 56.1 Stmt. ¶ 5; Garrett Decl. Ex I: Journal Registration.) However, "unless the copyright owner of a collective work also owns all the rights in a constituent part, a collective work registration will not extend to a constituent part." *Morris*, 283 F.3d at 505–06 (analyzing Copyright Office Circular No. 62 (Serials)). Defendants contend that the journal registration did not effectively register the Articles because the Publishing Agreements transferring the copyrights to Elsevier granted the authors the right to use and distribute certain versions of the Articles for "scholarly purposes." (Publishing Agreement at 2.) However, the authors retained only a non-exclusive license in the Articles which did not limit Elsevier's copyrights and ability to register the Articles by registering the Journal.

Section 101 of the 1976 Copyright Act defines a "transfer of copyright ownership" to be an "assignment . . . of a copyright or any of the *exclusive* rights comprised in a copyright whether or not it is limited in time or place of effect, *but not including a nonexclusive license.*" 17 U.S.C. § 101 (emphasis added). "Each right or even a portion of a right may be transferred separately from the initial bundle of rights. So long as the right transferred is *exclusive*, the transferee is considered the 'copyright owner' of that right." *Patry* § 5:123 (emphasis added) (citing, *inter alia, Video–Cinema Films, Inc. v. Lloyd E. Rigler–Lawrence E. Deutsch Found.*, No. 04 Civ. 5332(NRB), 2005 WL 2875327, at *5 (S.D.N.Y. Nov. 2, 2005); *Peter Pan Fabrics Inc. v. Lida Fabrics Inc.*, No. 91 Civ. 3172(PKL), 1992 WL 131609, at *2 (S.D.N.Y. June 4, 1992)).

The Transfer Agreements and form Publishing Agreement grant, without limitation, "the copyright" in the Articles to Elsevier. (Transfer Agreements; Publishing Agreement at 2.) Although the Publishing Agreement grants the authors a license to use and distribute certain versions of the Articles for non-commercial, scholarly purposes, it does not grant the authors an exclusive license to do so. *See Papa's–June Music, Inc. v. McLean*, 921 F.Supp. 1154, 1159 (S.D.N.Y.1996) ("[W]hile it is not required that the writing explicitly mention 'copyright' or 'exclusive rights,' the better practice is that is should.") (citations omitted). Nothing in the Publishing Agreement indicates that the authors retained exclusive rights or that Elsevier was in any way limited from granting similar rights in the Articles to individuals other than the authors.

*Morris* is distinguishable and illustrates clearly the difference between the retention of exclusive versus non-exclusive rights. There, the Court of Appeals considered whether a registration of an issue of *Allure* magazine constituted registration of an article published within that issue. *Morris*, 283 F.3d at 505–06. In contrast to the Publishing Agreements here, the author in *Morris* transferred only a limited right to publish the article in a single issue of *Allure* while retaining for herself all other exclusive rights in the work. *Morris*, 283 F.3d at 505–06. Thus the Court of Appeals held that registration of the issue of *Allure* did not constitute registration of the article. *Morris*, 283 F.3d at 505–06. In this case, the authors' retention of a non-exclusive license did not disrupt the transfer of all of the copyrights in the Articles to Elsevier. Therefore, Elsevier properly registered the Articles by registering the Journal. Accordingly, Defendants motion for summary judgment on this issue is denied.

296

*CONCLUSION*

For the foregoing reasons, Plaintiffs' motion for partial summary judgment is denied, and Defendants' motion for summary judgment is denied. The parties shall submit a joint proposed schedule for the completion of all remaining discovery to Magistrate Judge Maas by March 17, 2011. The Clerk of Court is directed to terminate the motions pending at Docket Nos. 63 and 77.

SO ORDERED.